WILSON, *Appellant,* v. BECKWITH.

Division One, June 19, 1893.

1. **Land Titles:** RAILROAD GRANTS: ACT OF CONGRESS: MORTGAGE. By act of congress of February 9, 1853, the general government granted to the state a right of way through the former's public lands between designated points, and also granted to the state every alternate section of land designated by even numbers for six sections in width on each side of the road for the purpose of aiding in making railroads and branches, and it was further provided that the legislature might dispose of the lands for the purposes aforesaid and for none other. By act of the legislature of Missouri of February 20, 1855, (Laws 1854, p. 314), the state granted to the Cairo and Fulton Railroad Company the lands so granted to the state by the act of congress for the uses and purposes and subject to the conditions contained in said act of congress and the company was further authorized by said act of the legislature of this state to issue bonds and secure the same by mortgage on said lands in order to raise funds to construct the railroad. By a subsequent act of the legislature of December 11, 1855 (Local Acts, p. 469), the state was authorized to issue aid bonds to the Cairo and Fulton Railroad Company and it was further provided in said act that no part of the bonds should be delivered until the company signified its acceptance by filing a receipt therefor with the

Wilson v. Beckwith.

secretary of state and that when recorded in the office of the secretary of state each certificate should be a mortgage on the road. *Held*, that all persons claiming under a deed of trust executed by the company under the act of February 20, 1855, said deed of trust reciting that it was subject to the lien of the state created under the act of December 11, 1855, took subject to all the certificates previously filed with the secretary of state.

2. ——: ——: STATUTORY MORTGAGE: RECORDS OF. Nor was the statutory mortgage required to be recorded in the counties in which the company's lands were situated.

3. ——: ——: STATE'S LIEN: MORTGAGE. The act of the legislature of December 11, 1855 (Local Laws, p. 649), provided that said certificates should be a mortgage "of the road and and every part and section thereof and its appurtenances." *Held*, that the lien of the state acquired under said certificates did not include the railroad lands granted to the company by the state since they were not appurtenant to the road.

4. **Land**: APPURTENANCE. A thing may be said to be appurtenant to something else, only when it stands in the relation of an incident and is necessarily connected in the use and enjoyment of the latter.

5. **Land Title**: RAILROAD GRANT: STATE'S LIEN: MORTGAGE. The act of the legislature of March 3, 1857 (Laws 1856-7, p. 85), extending state aid to several railroads by a loan or guaranty of bonds included therein an additional loan to the Cairo and Fulton Railroad Company and provided that the bonds so issued "should constitute a first lien or mortgage upon the road and property of the several railroad companies receiving them." *Held*, that the lien created by this act did not extend the state's lien over said railroad lands granted by congress to the state and by the latter to the company. .

6. **The rule of stare decisis** discussed.

*Appeal from St. Louis City District Court.*—Hon. L. B. Valliant, Judge.

Reversed and remanded.

*H. J. Cantwell* and *Albert N. Edwards* for appellant.

(1) In interpreting a statute, the whole of it must be considered, and if in one section provisions are introduced which show the sense in which the legisla-

ture employed a doubtful phrase used, that sense is to be adopted in construing such phrase. Every part must be construed in connection with the whole so as to make all parts harmonize. *State to use v. Heman*, 70 Mo. 411; *Washington Market v. Hoffman*, 11 Otto, 112; *Platt v. Railroad*, 9 Otto (98 U. S.), 48. (2) The object of all rules of interpretation is to discover the intent. When the terms of a law or contract are ambiguous, the subject-matter and object of the statute is to be considered in construing it. Conditions existent at the time of the passage of the statute must be considered, and not conditions at date when statute is construed. *Spitler v. Young*, 63 Mo. 44; *State ex rel. v. Dinling*, 66 Mo. 379; *Platt v. Railroad*, 9 Otto 48. (3) Statutes must be interpreted, if possible, so as to make them consistent with the constitution. *Phillips v. Railroad*, 86 Mo. 540; *Presser v. Illinois*, 116 U. S. 252. (4) The law of February 20, 1855, authorizing the railroad company to mortgage the lands for funds to build the road, was not repealed by the Act of December 10, 1855, nor by that of March 3, 1857, and the later acts must be construed with it. *Railroad v. Cass County*, 53 Mo. 17; *McVey v. McVey*, 51 Mo. 406; *United States v. Gear*, 3 How. 120; *Ex parte Cow Dog*, 109 U. S. 556; *State v. Stoll*, 17 Wall. 425. (5) Two acts passed at the same session of the legislature relating to the same subject-matter are in *pari materia*, and to arrive at the true legislative intent, they must be construed together. *State v. Clarke*, 54 Mo. 218. *Ergo:* The act of March 3, 1857 and section 2 of act of same date must be construed together. (6) When a state becomes a party to a contract, the same rules of law are applied to her as to private persons under like circumstances. *Davis v. Gray*, 16 Wallace, 203. (7) The subsequent declarations of the state evidencing that no lien was ever intended to be created on the lands are

admissible, and effectual as a waiver of any lien, the state ever had, if any, on the lands. *Brown v. State,* 62 Maryland, 439; *State to use v. Heman,* 70 Mo. 441. (8) Neither the passage of act of March 3, 1857, nor the acceptance of the act constituted a contract between the Cairo & Fulton Railroad Company and the state for the reason that there was no consideration then, nor was there a meeting of minds (unless our view of what the state intended is adopted). The passage of the act, and the acceptance of it, even on the exact terms proposed, only constituted the mere statement of preliminary terms to which reference might have been made, had a contract in accordance therewith been afterwards consummated. The state was not bound, therefore, the other side was not. The railroad company agreed to do nothing of value to the state, and was required to do nothing until the bonds should be received. *Trustees v. Rider,* 13 Conn. 87; *Town v. Portsmouth,* 92 U. S. 625; *Tilley v. Chicago,* 103 U. S. 155; *Ellison v. Henshaw,* 4 Wheat. 225; *Bank v. Hall,* 101 U. S. 43. Now the railroad company only said, and the state only required it to say: That when it (the railroad company), should spend so much money (if it ever did), that it, the railroad company, would take certain bonds of the state, which should then be a lien upon the road. (9) The word "property" has no fixed meaning. It may, when used in a will to take effect after a man has no further use for property, be sufficient to include all he was possessed of; but it can only be construed to have that effect in other instances when there is no other evidence to limit the sense in which it was used. *Alabama v. Montague,* 107 U. S. 602; *Smith v. McCullough,* 104 U. S. 25. (10) The purchaser under the foreclosure sale of the Cairo & Fulton Railroad took only such rights as the Cairo & Fulton Railroad Company, had at that time released from the debt of the

state. *Railroad v. McGee*, 115 U. S. 476. (11) The act of congress July 28, 1866, was a waiver of forfeiture and not a new grant. *Railroad v. McGee*, 115 U. S. 460; act of congress, June 10, 1852. (12) The "sell-out" act of 1866, could confer no new rights, nor divest rights already vested. No state shall pass any law impairing the obligation of contracts. U. S. Constitution, art. 1, sec. 10.

*H. S. Priest* and *M. L. Clardy* for respondent.

(1) The act of congress of February 9, 1853, was a grant *in præsenti* with a condition subsequent, to-wit: that the road should be completed within ten years. The purpose of the act of July 28, 1866, was to waive any right of forfeiture which existed in favor of the United States, at the time of the passage of the act and to extend the time for the completion of the road. (2) In the first mortgage, the state took its security upon the road and its appurtenances; act of legislature, December 11, 1855, section 3. (3) In its second mortgage the state reserved a lien not only upon the road of the company, but upon its property, meaning its other property, and all of its other property; act March 3, 1857, section 17. (4) The generality of its language forms no objection to the validity of the mortgage. *Wilson v. Boyce*, 92 U. S. p. 325. (5) The language of the statute reserving the lien of the state is plain, and matters extrinsic to it ought not to be invoked to make it ambiguous. Even the adverse contemporaneous construction of a statute is entitled to no weight where the intent of the law maker is evident. *Wear v. Hickman*, 5 Mo. 147. Courts ought to construe a statute liberally with a view to the establishment of a charge as against the company itself, or those claiming under it, because if the charge was

actually created by statute, those dealing with the company were bound to take notice of it. *Tompkins v. Railroad*, 125 U. S. 127. Section 5, of the law of February 20, 1855, was so far amended by the act of March 3, 1857, as to make the mortgage for securing the payment of the bonds to be issued by the company subject to the state's lien. (6) Section 16, of the act of March, 1857 (p. 67, abstract), provides that before the governor shall issue any bonds under the provisions of the act, the company shall, by resolution of its board of directors, agree to accept the provisions of such act. The resolution of the board of directors reciting that "this company hereby accepts the provisions of said act of March 3, 1857," consummated the contract between the state and the railroad company by which the latter in consideration of the loan of the state's credit agreed that the state should have "a prior, first and only lien in the nature of a mortgage" on its railroad and property to secure and indemnify the state against the payment of the bonds of the state which might be issued by the company. This statutory mortgage was in the nature of a mortgage for future advances. *Foster v. Reynolds*, 38 Mo. 553; *Brant v. Robertson*, 16 Mo. 129. (7) All persons dealing with the railroad company are presumed to have known the tenor and effect of the act of the legislature reserving the state's lien. And besides the trust deed to Moore, Wilson and Waterman recorded in Mississippi county, referred to the acts of December 11, 1855, and March 3, 1857, and in law those under whom plaintiff claims bought with knowledge of the provisions of said statute. A purchaser is bound to read a prior recorded deed in the light of all the facts shown upon its face, and is chargeable with all the information to which such facts lead. *Wolfe v. Dyer*, 95 Mo. 545. (8) There was no waiver of the state's lien; there could have

been no waiver except by the legislature.  2 Herman on Estopple and Res Judicata, pp. 810 and 811.  Even as between private individuals the lien of a mortgage can only be waived by facts constituting an equitable estoppel.  *Christian v. Newberry*, 61 Mo. 446; *Savings Association v. Mastin*, 61 Mo. 435.  (9) All the questions arising in this case have been settled adversely to plaintiff in the following well considered cases: *Whitehead v. Vineyard*, 50 Mo. 30; *Wilson v. Boyce*, 92 U. S. 320; *Chouteau v. Allen*, 70 Mo. 327; *Railroad v. McGee*, 115 U. S. 476.  (10) These decisions have become a rule of property and titles have been vested on the strength of it.  The certainty of the rule is even more important than the reason of it; the maxim *stare decisis et non quieta movere*, is the only safe rule and should be adhered to.  *Reed v. Ownby*, 44 Mo. 206; Wells on Res Adjudicata and Stare Decisis, sections 595–600; 2 Herman on Estoppel and Res Judicata, pp. 116–17–23.

BLACK, P. J.—This was an action of ejectment to recover possession of forty acres of land in Mississippi county.  The cause was transferred from that county to St. Louis, where there was a trial, and judgment for defendant.  As the case is one of much importance, because of other suits depending upon the same titles, we deem it proper to state the facts with some detail.

On the ninth of February, 1853, congress passed an act (10 United States Statutes, 155), granting to the states of Arkansas and Missouri a right of way through the public lands for a railroad from a point on the Mississippi river opposite the mouth of the Ohio to Fulton on the Texas boundary, by the way of Little Rock; also granting to said states, respectively, every alternate section of land designated by even numbers, for six sections in width on each side of the road, "for the pur-

poses of aiding in making the railroad and branches aforesaid,'' and providing that the legislature might dispose of the lands ''for the purposes aforesaid, and no other.'' Section 5 provides: ''Section 5. * * * That the lands hereby granted to said states shall be disposed of by said states only in the manner following: that is to say, that a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of said road, may be sold; and, when the governors of said state or states shall certify to the secretary of the interior that twenty continuous miles of said road is completed, then another like quantity of land hereby granted may be sold; and so from time to time, until said road is completed; and if said road is not completed within ten years, no further sales shall be made, and the land unsold shall revert to the United States.''

On the twentieth of February, 1855, the legislature of this state passed an act (Acts 1854, page 314) granting to the Cairo & Fulton Railroad Company, a corporation organized under the laws of this state, the lands granted to this state by the act of congress before mentioned, ''for the uses and purposes, and subject to the conditions, reversion, and provisions, set forth and contained in said act of congress and this act.'' Sections 5 and 8 are as follows: ''Section 5. For the purpose of raising funds, from time to time, for the construction of the said railroad, the said company may sell the said lands in the manner provided for by the said act of congress, and may issue their bonds in such sums as they may deem proper, at rates of interest not exceeding seven per cent. per annum, payable semi-annually, and the principal of said bonds payable at such time and place as they may designate and may secure the payment of said bonds by mortgage of said lands, or any part thereof, to be executed by said company, and

may make the said bonds convertible into land or stock of the company within such periods as they may prescribe: *Provided,* that the faith of the state is in no manner pledged for the redemption of said bonds, or any part thereof; *and provided further* that nothing in this act contained shall be construed to authorize said company to sell, dispose of, or apply the said lands, or the proceeds thereof, in any other manner, or to any other purpose, than as required and limited by the said act of congress."

"Sec. 8. In case any of the lands located or selected under the act of congress aforesaid shall remain unsold at the expiration of ten years after the completion of said road, the same shall be offered at public sale annually, until the whole is disposed of except such lots as may be deemed necessary by said company for practical purposes in sustaining and operating their said railroad."

It may be stated here that the act of congress provides that if it shall appear, when the road is located, that the United States have sold any of the lands thereby granted to the state, the state may, by an agent appointed by the governor, select other lands in lieu thereof. It appears there were 12,887 acres of vacant even-numbered sections which passed to the state by the act of congress. The parcel of land in suit is a part thereof, and is within the first twenty mile section of the road, and lies about two miles south of the railroad. The total amount of land granted by the act of congress, including that selected for even-numbered sections which had been sold, does not appear by this record, save as set forth in the report of the board of public works, hereafter mentioned. By the act of eleventh of December, 1855, (Local Acts 1855, page 469), the legislature provided for issuing state aid bonds to the Cairo & Fulton Railroad Company to the amount of $250,000

and provided that no part of the bonds should be delivered until the company signified its acceptance by filing a receipt for the bonds with the secretary of state.

Section 3 is in these words: "Sec. 3. Each certificate of acceptance so executed and filed, as aforesaid, shall be recorded in the said office of the secretary of state, and shall thereupon become and be, according to all intents and purposes, a mortgage of the road, and every part and section thereof, and its appurtenances, to the people of this state, for securing the payment of the principal and interest of the sums of money for which such bonds shall, from time to time, be issued and accepted as aforesaid."

Bonds were issued under this act, and receipts filed therefor to the amount of $250,000 in August, October and December, 1857. On the third of March, 1857, the legislature passed another act (Laws, 1856, 1857, p. 85) extending state aid to five or six railroad companies by a loan or guaranty of bonds, including therein an additional loan of $400,000 to the Cairo & Fulton Railroad Company. All the bonds issued under this act had thirty years to run. And section 17 is in these words: "Sec. 17. All bonds issued under the provisions of this act shall constitute a first lien or mortgage upon the road and property of the several companies so receiving them, in the same manner as provided by the act approved February 22, 1851, 'to expedite the construction of the Pacific railroad and of the Hannibal & St. Joseph railroad,' and the act approved December 10, 1855, of which this is amendatory." Bonds were issued under this act to the Cairo & Fulton Railroad Company to the amount of $400,000 in April and July, 1859. The Cairo & Fulton Railroad Company having made default in the payment of the state aid bonds, the legislature passed two acts—one on the nineteenth of February, 1866, and the other on

the nineteenth of March, 1866—directing the governor
to foreclose the state's lien, and providing for a board
of commissioners to bid in the property, and giving
the commissioners power to sell the property so pur-
chased.

The eighth section of the first-named act contains
this proviso: "That nothing in this act shall be so
construed as to convey, or to authorize the commis-
sioners to convey to the purchasers of the Cairo &
Fulton railroad any of the lands subscribed by counties
to the stock of said road."

Pursuant to these acts, and the powers contained
in the before-mentioned aid acts, the governor sold and
conveyed to the state the "said Cairo & Fulton railroad,
and every part and section thereof, so far as the same
is constructed, completed or projected, together with
its appurtenances, rolling stock, and property of every
description, and all rights and franchises thereto
belonging." The deed bears date the twelfth of Octo-
ber, 1866. The state, by a like description, conveyed
the property to Read, Mackay, Vogel and Simmons by
deed dated the seventeenth of January, 1877, and they,
by a like description, conveyed the property to Thomas
Allen. The title to the property passed from him to
the Cairo, Arkansas & Texas Railroad Company.
That company and the St. Louis & Iron Mountain
Railroad Company organized in 1866, consolidated
under the name of the St. Louis, Iron Mountain &
Southern Railway Company, which last-named com-
pany conveyed the land in suit to the defendant by
deed dated in 1882.

The plaintiff's title arises in the following manner:
The Cairo & Fulton Railroad Company, by a deed of
trust bearing date the twenty-third of May, 1857,
acknowledged on the thirtieth of April, 1858, and
recorded in Mississippi county on the fifth of June, 1858,

conveyed to John Moore, John Wilson and Albert S. Waterman some 400,000 acres of land, including the land now in suit, also the roadway, stations, depots and engine houses to secure bonds of the company to the amount of $1,600,000. The deed of trust makes a clear distinction throughout its provisions between the lands and the road and its appurtenances. The lands are declared to be free of incumbrance, but the deed states that it is made subject to the lien of the state created by the acts of the eleventh of December, 1855, and the third of March, 1857, as to the "railroad and every part and section thereof and its appurtenances." This deed of trust provides that the possession, use, management and control of "said railroad, with all the appurtenances thereto belonging," shall remain with the company, and, as to the road, the power of sale shall remain in abeyance until the state's lien shall be discharged, but as to the lands it is provided that the trustees shall be deemed to be in the legal possession thereof. They are required to sell for cash, or for part cash and partly on credit, or for bonds of the company, the cash to be used in the purchase of bonds. It is made their duty to cancel the bonds when purchased or taken for land, and to execute to the purchasers deeds, the deeds to operate as a discharge of the lien of the deed of trust thereon.

Pursuant to these powers the trustees conveyed the land in suit and other lands to one Hamilton, by deed dated in November, 1859. Hamilton conveyed to Stevens, and the latter conveyed to Blakely Wilson, of New Jersey, by a deed dated in 1860. It appears from the testimony of Stevens that he sold and conveyed to Wilson six thousand eight hundred and twenty-eight acres in Mississippi and New Madrid counties, and eleven thousand eight hundred and ninety-six acres in Scott county. There is evidence

that Wilson paid taxes on these lands. He died in 1876, leaving a will whereby he devised all of the lands to his son, Edward, who died, leaving the plaintiff as his only heir. The plaintiff put in evidence the message of Governor Stewart, of December, 1858, to the general assembly, in which he says the Cairo & Fulton Railroad Company "has authorized the issue of land bonds amounting to $1,600,000, bearing seven per. cent. interest, payable in 1882, the payment of which is secured by a deed of trust on the lands;" also a report of the board of public works made at the same time, in which they say, when speaking of this company: "The amount of land subscribed by counties is four hundred and fourteen thousand and five hundred acres; donated by the government, fifty-six thousand and seven and ninety-three one hundredths. Four hundred thousand acres of these lands are held in trust to secure the bonds of the company for $1,600,000. The company has issued bonds to the amount of $500,000, $347,000 of which are hypothecated or delivered on contracts, and $153,000, at par value, are placed in the hands of agents for the use of the company."

1. All persons claiming under the deed of trust from the Cairo & Fulton Railroad Company to the trustees, Moore, Wilson and Waterman, took and held subject to any lien which the state acquired by the aid acts of 1855 and 1857, since both were passed before the date of the deed of trust. It is true these acts do not appear to have been recorded in the counties where the lands were situated, but there was no law requiring a statutory mortgage to be recorded in the office of the recorder of deeds. Indeed, the deed of trust professes on its face to be subject to the state's lien, and that was enough to put purchasers on their guard as to the extent of the lien. If, therefore, the aid acts, or

either of them, covered this land, then the foreclosure sale made in 1866 cut out and utterly destroyed the. title of those claiming under the deed of trust; but, if the state acquired no lien on this land by either of said aid acts, then the plaintiff has a perfect title.

2.   The state's lien created by the act of the eleventh of December, 1885, covered and included "the road, and every part and section thereof, and its appurtenances." If the land in suit is included in this description, it is because of the use of the word "appurtenances." A thing appurtenant is a thing used with and related to or dependent upon another thing more worthy, and agreeing in its nature and quality with the thing whereunto it is appendant or appurtenant. *Woodhull v. Rosenthal*, 61 N. Y. 382; 1 American and English Encyclopedia of Law, 641, 642. A thing is appurtenant to something else only when it stands in the relation of an incident to a principal, and is necessarily connected in the use and enjoyment of the latter. *Humphreys v. McKissock*, 140 U. S. 304. As a general proposition, land cannot be an appurtenance to land. The land here in question did not stand in the relation of an incident to the road, nor was it necessary, or even convenient, in the operation of the road. It stood as independent property, having no connection or relation whatever to the railroad in point of use, and was and is not an appurtenance thereto in any sense. The state therefore acquired no lien on this land by the act of the eleventh of December, 1855. This is clear.

3.   We come then, to the act of the third of March, 1857, the descriptive words of which are, "the road and property of the several companies so receiving them" (the bonds). The question here turns upon the meaning to be given to the word "property." There can be no doubt but this term is far more comprehensive than appurtenances. "Property," when unrestricted, includes

every class of property which a man can own, but it is generally used in a less comprehensive sense. The question as to what lands these words covered came up for consideration in *Whitehead v. Vineyard*, 50 Mo. 30, which was an action of ejectment. In that case the plaintiff claimed title under Thomas Allen, who claimed under a sale of the Iron Mountain Railroad, the sale having been made to foreclose the state's lien created by aid act of 1857, the same law now in question. It was there said that the sweeping phrase, "the road and property of the several companies," showed an intention to cover by the lien of the state all the corporate property of the companies, and the plaintiff prevailed. It does not appear from the report of the case how, or for what purpose, the company acquired the land. It seems certain, however, that the company did not acquire it by any land grant to aid in the construction of the road, as is the case here. *Wilson v. Boyce*, 92 U. S. 323, was also an action of ejectment. The plaintiff in that case derived title through the deed from the Cairo & Fulton Railroad Company to the trustees, Moore, Wilson and Waterman, bearing date the twenty-third of May, 1857, being the same deed under which the plaintiff claims in this case. The defendant's title there, was, as is the defendant's title here, founded upon the aid acts of the eleventh of December, 1855, and the third of March, 1857, and the sale made by the governor in 1866. Speaking of the descriptive words in the aid act of 1857, the court held that the generality of the language formed no objection to the validity of the statutory mortgage; and it was also considered that the difference between the language of the act of 1855 and that used in the act of 1857, showed an intended extension of the security taken by the state. The title under the state's lien prevailed over that under the deed to the trustees. The court there cited

with approval the case of *Whitehead v. Vineyard.*
Both of these cases were cited with approval in *Chouteau
v. Allen*, 70 Mo, 290, 327.

*Railroad v. McGee*, 115 U. S. 469, was an action
of ejectment for forty acres of land in Stoddard county.
The land then in suit was a part of the land granted to
this state by the act of congress of the ninth of Febru-
ary, 1853, and by this state granted to the Cairo &
Fulton Railroad Company by the act of the twentieth
of February, 1855. The company conveyed the tract
of land then in suit to the defendant McGee on the
third of January, 1859, which was long after the pas-
sage of the aid act of 1857. The plaintiff's title was
the same as that of the defendant in this case; that is
to say it was derived through the state foreclosure sale
made by the governor in 1866. The land in suit in
that case was more than forty miles from the starting
point of the railroad, and it did not appear that a suffi-
cient number of miles had been built to authorize the
sale when McGee purchased. One question was whether
there had been a forfeiture under the last clause of sec-
tion 5 of the act of congress. It was held that the
subsequent act of congress of July, 1866, did not
amount to a declaration of forfeiture, but, on the con-
trary, was a waiver of the forfeiture, so that the title of
McGee stood precisely as it would if the company had
completed its road within the time specified in the act
of congress. It was then held that the purchaser at
the sale made by the state in 1866, took subject to
McGee's rights, and the judgment in favor of McGee
was affirmed. Looking to the conclusion there reached,
in the light of the further facts disclosed by this record,
that case would seem to overrule the case of *Wilson v.
Boyce*, and be an authority in favor of the plaintiff
here. But the court goes on to say the ruling then
made was not in conflict with the *Wilson-Boyce case*,

and it was said "no title is set up under any lien in favor of the state superior to that of McGee." It would seem, therefore, that the aid acts were not then before the court.

On the part of the defendant it is claimed that the *Whitehead-Vineyard* and the *Wilson-Boyce cases* rule this one, while it is insisted, on the other hand, that they are not precedents here, because many material facts are disclosed by this record which were not brought out in those cases. Says Kent: "A solemn decision upon a point of law arising in any given case, becomes an authority in a like case, because it is the highest evidence we can have of the law applicable to the subject, and the judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was misunderstood or misapplied in that particular case." 1 Kent's Commentaries [13 Ed.], 476. This *stare decisis* rule is a valuable one, for on it depends the stability of judicial decisions and the security of property and property rights. But the doctrine has some limitations just as valuable and important as the rule itself. It is out of place here to speak of more than one of them. It is in a "like case" that the prior decision upon a point of law is to be followed. As said by Kent, "the great difficulty as to cases consists in making an accurate application of the general principle contained in them to new cases, presenting a change of circumstances. If the analogy be imperfect, the application may be erroneous." To call for the application of the doctrine it is not necessary that the facts should be precisely the same. As said by Chamberlain, the limitation to "like cases" refers only to cases which are alike in principle. Chamberlain Stare Decisis, 14. Now, it does not appear from the *Whitehead-Vineyard case* how, or for what purpose, the railroad acquired the land there in question, but it is

evident that the act of congress of the ninth of Febru-
ary, 1853, and the act of the legislature of the twentieth
of February, 1855, had nothing to do with that contest.
The point of law decided was that the words "the road
and property of the companies," standing alone, inclu-
ded land owned by the company, whether appurtenant
to the road or not.    That, we think, was also the ques-
tion decided in  *Wilson v. Boyce,* for no mention is
made of either of said acts in the statement of facts or
in the opinion.    When we examine that case with care,
it is evident to. our minds that it was presented to the
court so as to call for a consideration of those words
just as if they stood alone.    This conclusion finds sup-
port in an observation made by the same court in a
a subsequent case, where it was said:  "In all these
cases referred to in  *Wilson v. Boyce,* 92 U. S. 320,
there were no words to qualify the generality of this
description."  *Alabama v. Montague,* 117 U. S. 610.
We shall take it as settled law that the words of the
aid act of 1857 before quoted, include the land here
in suit, unless it is excluded by force of prior legisla-
tion.    To the extent that the prior acts qualify the
general language of the act of 1857, to that extent
*Whitehead v. Vineyard* and *Wilson v. Boyce* are not in
point here, and to that extent this is not a "like case."
What effect should be given to the act of congress and
the act of the twentieth of February, 1855, in determin-
ing the rights of the parties to this land, is therefore
an open question, and one which we proceed to con-
sider.

Looking, now, to the act of congress of 1853, we
find it donates the lands to this state for a specific pur-
pose, namely, to be disposed of, and the proceeds used
in building a railroad between the designated points.
It provides that the state shall dispose of the lands in
the manner, and only in the manner, there pointed out.

Aside from a quantity not exceeding one hundred and twenty sections within the first twenty-mile section of the road, the state had no right or power to make an absolute disposition of the lands, except as twenty-mile sections of the road should be completed, and that fact certified, from time to time, to the secretary of the interior. The completion of sections of the road and the certificate of the governor are conditions precedent to the power of the state to sell the lands. *Farnsworth v. Railroad*, 92 U. S. 49. Besides all this, the act of congress contains the condition subsequent that, if the road is not completed in ten years, the state can make no further sales, and the unsold lands shall revert to the United States. Such were the terms and trusts upon which the state took and held the lands. The state, in turning them over to the Cairo & Fulton Railroad Company, placed them in the hands of that company for the same purposes, and subject to the same conditions. This is clear, for the act of 1855 provides that the lands "shall vest in full and complete title to the Cairo & Fulton Railroad Company, for the use and purposes, and subject to the conditions, reservation, and provisions set forth in said act of congress and this act;" and the proviso to the fifth section declares that nothing in the act contained "shall be construed to authorize the company to sell, dispose of, or apply the said lands or proceeds thereof in any manner, or to any other purpose, than as required by said act of congress." The act of 1855 makes the further provision that, if any of the lands remain unsold at the expiration of ten years after the completion of the road, the same shall be offered at public sale annually. It will therefore be seen that the grant made by the state to the company did not free the lands of the trust for which the state held them. The lands were, in the hands of the company, subject to the same trust as if they had remained

in the hands of the state, namely, to be disposed of, and the proceeds used in the construction of a railroad between the designated points, and full power to sell and mortgage them was conferred upon the company by the act of 1855. Now, there is not a word in the act of 1857 which professes to amend, repeal, or modify the act of 1855.

The act of 1855 remained in full force, unless repealed by implication. If the legislature had intended to extend the state's lien over these lands, set apart in the most solemn manner, and upon the most solemn trust, for the purpose of being sold, and the proceeds converted into a railroad, it seems reasonable to believe it would have in terms modified the act of 1855. The general language of the act of 1857, made to apply, as it does, to four or five railroad companies, it seems to us, cannot have the effect of repealing any part or portion of the special act of 1855 relating alone to the Cairo & Fulton Railroad Company. These acts of 1855 and 1857 were duly and formally accepted by the company, and when accepted, became contracts between the state and the company. By the first the lands were effectually set apart to be by the company sold or mortgaged, and the proceeds used in building the road. The company had the right to so use them as the work progressed, but it could use them for no other purpose Can it be said the acceptance of the act of 1857 abrogated the prior contract? and that is what must be said if we extend the state's lien over these lands, for it is manifest the lands could not be used, as in the act of 1855 contemplated, with a lien of $400,000 upon them. We think not. No intention having been expressed to modify the former contract, the latter should be construed so as to leave the former in full force, and this is done by leaving these lands where the act of 1855 placed them.

In determining the question whether the words of the act of 1857 extended the state's lien over these congress lands, we must seek for the legislative intent. To do this we must look to the prior act of 1855, and the subject-matter of both acts. We must place ourselves in the position of the legislature when those acts were passed. We have seen that the legislature, by the act of 1855, made it the duty of the company to offer at public sale all the lands not sold at the expiration of ten years after the road should be completed. In imposing this requirement upon the company the legislature must have had in view the early sale and settlement of these lands. To say that the aid act of 1857 extended the state's lien over them is to say that the legislature intended to withdraw them from sale for a period of thirty years, until the maturing of the bonds, for it is unreasonable to suppose that the lands could be sold to settlers with such an incumbrance upon them. Besides all this, the company did not hold these lands as its general property. As has been seen, it held them in trust, namely, for the sole purpose of disposing of them and converting them into a railroad property.

All these acts of the legislature, taken together, show that it was the policy of the state at that day to secure completed railroads, and it was not the policy of the state to extend the state's lien over lands which had been set apart to be converted into railroads. Thus, the fourth section of the act of 1857 provides that if the Pacific Railroad fail to complete the Southwest Branch in four years, or fail to perform other conditions therein specified, then the lands appropriated to the construction thereof and belonging to the said company at the time of such default shall at once vest in the state. This company, it will be seen, could continue

to sell such lands, and use the proceeds in constructing the road, until default made.   The great object which the legislature had in view in all of these aid acts was to secure completed roads, and to secure a lien on the roads when completed.   At that day the railroad companies were pressed for means to complete the enterprises, and it was not the policy of the state to tie up any property of the companies which had been set apart for construction purposes, and which could be used for no other purpose.   Moreover, it is shown beyond doubt that the governor and the board of public works knew in 1858, that the Cairo & Fulton Company had placed a deed of trust on these lands to secure $1,600,000 of the bonds of the company, and that a part of the bonds had been issued, and a part of them sold, and that others were in the hands of agents for sale.   They speak of these bonds as valid obligations, and of the company as in good condition, and its bonds a safe investment.   That these state officials construed the act of 1857 as not extending the state's lien over these lands is quite manifest.   The deed of trust made by the company to Moore and others shows beyond all doubt that the company supposed these lands, as distinguished from the road and its appurtenances, were free and clear of incumbrance, save that created by the deed of trust itself.

This contemporaneous construction, given to the aid act of 1857 by the state officers and by the company, is entitled to great weight in determining whether it was the intention of the legislature to include these lands in the state's mortgage; and this is especially true when we keep in mind the fact that these acts of 1855 and 1857 were, in substance and effect, contracts. It is true the "sell-out" act of 1866 provides that nothing therein contained shall be construed so as to convey or authorize the commissioners to convey to the pur-

chasers of the Cairo & Fulton Railroad Company any of the lands subscribed by counties for stock in that company. The inference may be drawn from this proviso that the legislature then supposed the state's lien covered the lands subscribed by counties, but no other inference can be drawn therefrom. We cannot see that the proviso has the least tendency to show that the legislature, even at that late day, supposed these congress lands were covered by the state's lien. We do not know upon what terms the company held the swamp lands subscribed by counties, and we express no opinion here as to whether they were or were not covered by the state's lien. We are here concerned with the congress lands, and nothing else. Our conclusion is that the state's lien created by the aid act of 1857 did not cover or include these congress lands. The company did not hold them as its general property. The company held them upon trust, to be disposed of, and the proceeds applied in the construction of the railroad. It seems to us evident that the general words "the road and property of the companies" do not, and were not intended to, embrace lands so set apart and held in trust for construction purposes. We do not see how any other conclusion can be reached.

The judgment is reversed and the cause remanded. BARCLAY, J., absent. The other judges concur.