### WILSON v. WARD LUMBER CO.

(Circuit Court, E. D. Missouri, E. D. May 13, 1895.)

No. 3,788.

1. RAILWAY LAND GRANTS—AID BONDS—LIEN—DESCRIPTION OF PROPERTY.
    Act Mo. Dec. 11, 1855 (Local Laws 1855, p. 469), authorized the issue of bonds in aid of the Cairo & Fulton Railroad Company, and provided that the state should have a first lien on the road and its "appurtenances." Act Mo. March 3, 1857 (Laws 1856–57, p. 85), granted said railroad com- pany additional aid, and provided that the bonds issued should constitute a first lien on the "road and property" of the company. Held, that the

state's lien covered lands granted to the state by Act Cong. Feb. 9, 1853, and by the state granted to said railway company to aid in its construction.

2. FEDERAL COURTS—COMITY—FOLLOWING STATE DECISIONS.

Where state statutes, affecting the title to large tracts of land, have been construed by the state supreme court, and the title so established has been reaffirmed by the United States supreme court, which decisions have remained unchallenged for many years, comity does not compel a federal court, when the title is again called in question, to follow a later decision of the state courts adverse to the title established by the earlier decisions.

Action by Florence A. Wilson against the Ward Lumber Company for trespass.

This is an action of ejectment, with consequential damages for cutting and removing timber from a large body of land in Mississippi county, in this state. The value of the timber being agreed upon, and a jury being waived, the case is submitted to the court on the single issue of title. The common source of title has its origin in Act Cong. Feb. 9, 1853, making a grant of the lands in question, for the purpose of aiding in the construction of the Cairo & Fulton Railroad, six sections in width on each side of said road. The said act provided, inter alia, that said lands so granted should be subject to disposal by the state legislature for the purpose in question. By Act Cong. July 28, 1866, the provisions of the first-named act were revived and continued for a period of 10 years. By an act of the legislature of Missouri of December 11, 1855, the governor of the state was empowered to cause to be issued and delivered to said railroad the bonds of the state, amounting to $250,000, with interest not exceeding 6 per centum per annum. This act provided that the certificate of acceptance of such bonds by the company should constitute a mortgage on said road, and every part thereof, and its appurtenances, to secure the principal and interest of said bonds. On the 3d day of March, 1857, the state legislature passed an act to amend an act entitled "An act to secure the completion of certain railroads in this state, and for other purposes, approved December 10, 1855," granting to the said Cairo & Fulton Railroad thereby an additional loan of $400,000. This latter act contained the following language: "All bonds issued under the provisions of this act shall constitute a first lien or mortgage upon the road and property of the several companies so receiving them in the same manner as provided by the act approved February 22, 1851, to expedite the construction of the Pacific Railroad and the Hannibal and St. Joseph Railroad, and the act approved December 11, 1855, of which this is amendatory." By section 15 of said act of 1857, it was provided that, in the event of the failure by the company to pay any part of the principal or interest of the bonds of the state issued under said act, the governor could take such steps as might be necessary and proper to foreclose the state's mortgage, and enforce its lien upon the property incumbered. The president of the Cairo & Fulton Railroad Company on the 29th of June, 1857, filed with the secretary of state the required certificate of acceptance by the road under the provisions of the act of December 11, 1855, and a like certificate on the 19th day of October, 1857, accepting the provisions of the act of March 3, 1857. On August 5, 1857, the said president filed with the secretary of state his receipt for 100 state bonds, at $1,000 each, and on October 17, 1857, he filed a like receipt for 80 state bonds of like denomination, and also receipts for the residue of said bonds, dated December 1, 1858, April 10, 1859, and July 25, 1859. After said enactments, and the said acceptances by the railroad company, and after the acceptance of a portion of the bonds of the state, the railroad company, by appropriate deed, conveyed to Moore, Wilson, and Waterman the roadway, stations, and depot, together with all its lands and real estate, in trust to secure the payment of certain bonds of the company. This deed of trust in its caption purports to be of date May 23, 1857, but was not acknowledged until May 28, 1858. By the recitations of this deed of trust it was made "subject to a prior first and only lien in the nature of a mortgage in favor of the state, made to secure and indemnify said state against the.

payment of said bonds, as said state may from time to time issue and deliver," etc., "under and by virtue of the provisions of the several acts of the general assembly of Missouri entitled as follows: 'An act to expedite the construction of the Cairo and Fulton Railway Company, passed December 11, 1855;' and also, 'An act to amend an act to secure the completion of certain railroads in this state, and for other purposes, approved December 11, 1855, approved March 3, 1857.'" The amount of said bonds secured by said deed of trust was not to exceed the sum of $1,600,000, with interest, with the proviso that nothing contained in said deed should have the effect or operate as a lien upon said railroad, nor any part nor section thereof, nor its appurtenances, prior or in derogation of, or in any way to interfere with, the lien of said state under the acts of the legislature aforesaid. The plaintiff in this case claims title under foreclosure proceedings instituted on a default in the said deed of trust to Moore, Wilson, and Waterman, by deed dated in 1859, to one Hamilton. Hamilton conveyed to one Stephens, and Stephens to Blakely Wilson, in 1860, under whom the plaintiff claims as heir. The defendant claims title as follows: The Cairo & Fulton Railroad Company having defaulted in the payment of said aid bonds, the legislature passed two acts, one of February 19, 1866, and the other of March 19, 1866, authorizing and directing the governor of the state to foreclose the state's lien, predicated of the acts of December 11, 1855, and March 3, 1857, providing for a board of commissioners to bid in the property at said foreclosure sale, with power in them to resell the property so purchased. Under these foreclosure proceedings the governor of the state, by deed October 12, 1866, sold and conveyed to the state "the said Cairo and Fulton Railroad, and every part and section thereof, so far as the same is constructed, completed, or projected, together with its appurtenances, rolling stock, and property, of every description, and all rights and franchises thereto belonging." By a like description, by deed January 17, 1877, the state conveyed the property to Reed, Mackey, Vogle, and Simmons, who conveyed the property to Thomas Allen. From Allen this title passed to the Cairo, Arkansas & Texas Railroad Company, which consolidated with the St. Louis & Iron Mountain Railway Company, organized in 1866, under the name of the St. Louis, Iron Mountain & Southern Railway Company, which last-named company, by appropriate deed, conveyed the land in suit, as a part of its claimed purchase, to the grantor of the defendant, by deed dated March 28, 1888.

H. J. Cantwell, A. W. Edwards, James A. Boone, and J. E. Burrough, for plaintiff.

M. L. Clardy, for defendant.

PHILIPS, District Judge (after stating the facts). From the foregoing statement of facts it is apparent that the question to be decided is whether or not the state of Missouri, by virtue of the two acts of 1855 and 1857, and the issue of the bonds giving the state's aid to said Cairo & Fulton Railroad Company, and its acceptance thereof, acquired a lien upon the lands granted to said railroad company, as well as to the railroad itself. If the state did acquire such lien, the title to the land in question unquestionably passed, under the foreclosure proceedings and mesne conveyances, to defendant's grantor. It is not contended by counsel for defendant that under the state's lien created by the act of December 11, 1855, title to the land passed by the foreclosure proceedings, as that lien applied only to "the road, and every part and section thereof, and its appurtenances"; the term "appurtenance" not being broad enough to extend to the lands outside of those used for and in connection with the location and operation of the road. But the whole controversy centers upon the construction to be given to the provision of the act of March 3, 1857, which extends the lien of the mortgage "upon

the road and property of such company." The act of 1855, in giving the state a lien for the first credit of $250,000 given the road, having limited its operation to the road and its appurtenances, while the act of 1857 extended the lien for the additional loan of $400,-000 to the road and property of the company, it would naturally seem that some effect and operation ought to be given to this change in phraseology, because the term "property" has a much wider range in its embrace and application than that of an appurtenant. The term "appurtenant," in its legal common acceptation, implies a thing as belonging to, accessory, or incident to, some other thing. As used in connection with land, it means a thing used with the land and for its benefit, annexed to and connected therewith. So the appurtenant of a railroad implies that it is incidental to, connected and used with, the road, as a part of and essential thereto, such as depots, stations, switches, and switch yards, and the like. But the term "property," as commonly used, denotes "any external object over which the right of property is exercised. In this sense, it is a very wide term, and includes every class of acquisitions which a man can own or have an interest in. Taking the word in the latter signification, property is broadly divided into real and personal property." Black, Law Dict. If A. should to-day loan B. $250,000, and take as security therefor a mortgage on B.'s dwelling house and appurtenances, and next year make to B. an additional loan of $400,-000, and take an additional mortgage security on the dwelling house and property of B., the difference in phraseology would at once challenge attention, and the ordinary mind would intuitively perceive a good and sufficient reason for extending the lien for the additional loan to other and additional security, well expressed in the more comprehensive term "property."

The danger which any court encounters, in seeking out a technical possible reason for giving the second instrument no larger scope than the first, lies in selecting one less reasonable and natural than the one based upon the idea the greater the risk the greater the security. Courts are ever exposed to the just criticism of legislating and making contracts when they undertake to give to a plain, ordinary legal term a meaning different from that of its common acceptation. It is said that it would have been easy for the legislature, had it intended by the act of 1857 to extend the state's lien to the company's lands, to have used the term "lands." With equal force may it be replied that, in the act of 1855, the legislature having restricted the lien to the road and its appurtenances, if its purpose was to so limit the operation of the second mortgage lien, why did it drop so simple and explicit a term as "appurtenances," and employ one more comprehensive, and whose general import was so universally recognized? Had the legislature employed the language, upon the road and lands of the company, it is not too much to say, perhaps, that the special reasoning based upon supposed legislative intent and statutes in pari materia, by which it is sought to reduce the term "property" to the degree of an appurtenant, would be invoked to qualify the term "lands," by making it apply to those incidents essential to the operation of the railroad.

It is further urged against the construction that the mortgage of 1857 extended to the lands of the company; that it would thwart the legislative policy declared in the act of 1855, which contemplated that the lands should be applied solely to the construction of the road; that by placing a mortgage upon them for $400,000, running for a period of 30 years, the sale of the lands for settlement would practically have been defeated. No such obstacle seems to have presented itself to the minds of the parties to the Moore, Wilson, and Waterman deed of trust, under which the plaintiff claims, for that trust was to run until 1882, nearly as long as the state's mortgage. Exactly how it is that the plaintiff, who must recover on the strength of his own title, and not on the weakness of the defendant's, can stand upon a mortgage of the lands which ran until 1882, while the defendant cannot defend under a mortgage from the same company anterior in time, running a little longer, is not apparent to my mind. So long as the proceeds of the bonds of the state loaned to the company were used in obtaining funds with which to build the road, it would hardly lie in the mouth of the company to say to the state, when it came to foreclose its mortgage, that your mortgage is void because the legislative acts and the congressional grant contemplated that the lands should be open to sale for the settlement of the country. Reduced to its logical substance, under plaintiff's contention, nothing passed under the "Sell-Out Act" of 1866, save the naked right to build the road, as no road of importance was then constructed. In other words, the state simply foreclosed a lien on a franchise to build a road to satisfy a claim of $400,000.

It is further insisted that under defendant's position there is a repugnance to the manifest purpose of section 4 of the act of 1857, whereby the state was to guaranty certain bonds issued by the Pacific Railroad Company, receiving a lien on both its road and lands, subject to the right of the mortgage authorized by section 3 of the act of 1855, of which the act of 1857 is amendatory. The mortgage referred to in section 4 was to guaranty the bonds, not of the state, but of the Pacific Railroad Company, to aid in the construction of the southwest branch of that road; whereas, the bonds mentioned in section 17 of the act of 1857, constituting a lien "upon the road and property of the companies," were issued directly by the state. The latter bonds ran for 30 years, while the Pacific Railroad bonds ran for 20 years, and the liability of the state as to the latter was merely that of guarantor. The Pacific Railroad mortgage constituted a first lien on the lands of the Southwest Company and the road itself. Manifestly, therefore, they were not the bonds referred to in section 17. The two sections refer to two subjects-matter, and, of consequence, there is no repugnance in the two provisions.

The power conferred by the legislature in the act of March 3, 1857, authorizing the transfer of the state's securities to the Iron Mountain Railroad Company "upon such terms and conditions as may be agreed upon between such parties," by no permissible construction gave authority to the companies to so change the con-

tract with the state as to relieve the railroad of the state's lien. The manifest intent of the legislature was that, in case of a consolidation of the two companies, the new company should succeed to all the benefits intended for both, but not discharged from the burdens which each has assumed.

The precise question under consideration came before the supreme court of this state for determination in the case of Whitehead v. Vineyard (decided in 1872) 50 Mo. 30. Judge Bliss, who wrote the opinion, discussed the direct question raised in that case, as to whether or not the lands of the company were included in the state's lien, and passed under the foreclosure proceedings. After referring to the various acts of the legislature in question, the learned judge said:

"Under the provisions of these acts and subsequent legislation the railroad was sold out, and defendant claims that the land in controversy could not have been sold because not included in the term 'appurtenances,' used in the act of February 22, 1851; that land outside of and not necessary to the use of the road is not appurtenant to it. It becomes necessary in this case to consider how much would be included in the term, had not the legislative intention been otherwise made clear. Were we compelled to go into the questions, it might become necessary to inquire into the object for which the land was acquired,—whether it must be held subordinate to or might be acquired independent of the only object of the organization. But the act of March 3, 1857, giving further aid to the several companies, and which was expressly accepted by them, not content with the term 'appurtenances,' uses the more unambiguous and sweeping phrase, 'the road and property of the several companies,' etc., unequivocally showing the intention to cover by the lien of the state all corporate property of the companies named in the act. Subsequent acts expressly refer to and cover land like that in controversy, and leave the legislative intention without a shadow of a doubt. The act of February 15, 1864 (Sess. Acts 1863–64, p. 382), authorizes the St. Louis & Iron Mountain Railroad Company to sell and loan its lands not needed for the use and purposes of the road, and provides that their proceeds shall be paid into the state treasury on account of the interest due upon state bonds, and that the lien of the state upon such lands shall cease. Also the act of February 19, 1866 (Sess. Acts 1865–66, p. 107, § 6), provides that in the sale of the respective railroads the commissioners shall 'award the roads, and every part and section thereof, their franchises and appurtenances, and all lands and other property, real and personal, to the highest and best bidders,' etc. This land, therefore, was included in the lien held by the state upon the property of the St. Louis & Iron Mountain Railroad Company, and passed by its sale, as provided in the last-mentioned act."

The identical question was again raised and passed upon in the case of Wilson v. Boyce (decided in 1875) 92 U. S. 320. The record facts in the report of this last case do not support the contention of counsel that some of the questions raised in the case now at bar were not brought to the attention of the court. An examination of the skeleton brief of counsel for plaintiff in error shows beyond question that the principal matters now presented as new for the consideration of this court were urged upon the supreme court, in which the attempt was vigorously made to demonstrate that from all the acts of the state legislature, in pari materia, the intention was clearly to restrict the lien merely to the road and its appurtenances. And the contention was further made in that case that to create such lien on the lands of the company, and to attempt to pass the title thereto by the foreclosure proceedings, was a perver-

sion of the purpose and object of the congressional grant to the state. The court approved and followed the decision of the state court in Whitehead v. Vineyard, supra. After holding that the term "appurtenances" did not extend to the lands of the company, Mr. Justice Hunt proceeded to a consideration of the effect of the second mortgage under the act of 1857 for securing the additional aid of $400,000, and said: "The question is, does the word 'property' in the statute create a valid lien on these lands?" and held that the term "property" was broad enough to and did embrace the lands of the company. Proceeding, the learned justice said:

"In the first mortgage, the state took its security upon the road and its appurtenances. In its second mortgage, it authorized and obtained security, not only upon the road of the company and every part thereof, but also upon its property, meaning its other property, and all of its other property. It is difficult to conceive any reason for this extension of language in the statute, except an intended extension of security. Time had passed without a completion of the road. A large additional loan was now made; and a desire to receive additional security gives a natural and logical explanation to the additional words inserted in the mortgage."

The opinion then proceeds to show that the decision in Whitehead v. Vineyard was not mere obiter dictum, but that "the point we are considering was the precise point before the court." And it was further held that the very mortgage under which the plaintiff claims in this action was subordinate to the state's lien under which the defendant claims; and in respect of the other question raised, as to such construction involving a perversion of the purpose of the congressional grant, the court said:

"It was quite within the competency of the railroad company to mortgage its lands not used for its track or appurtenances. It might be deemed prudent and judicious to raise money upon its collateral property rather than upon its road. It might lose its foreign lands, and still be successful as a railroad company. If it should lose its track, it must at once cease to exist."

The supreme court of this state in Chouteau v. Allen, 70 Mo. 327, 328, again expressly recognized that this question was settled in the cases of Whitehead v. Vineyard and Wilson v. Boyce. Chief Justice Sherwood said: "So far as respects the congress lands described in the deed of trust, it has been held that they passed in consequence of the sale which occurred October 1, 1866, and which was but the foreclosure of the first lien and statutory mortgage held by the state over all the property of the company,"—citing Whitehead v. Vineyard and Wilson v. Boyce. And then, proceeding to show that certain lands donated by the counties to the railroad were not affected by the mortgages in question, concluded with this language: "The title of Allen to the congress lands must therefore be regarded as free from flaw."

Thus stood the decisions of the courts, both state and federal, respecting this title, until 1893, when, for the first time in the history of the various litigations respecting these lands, the supreme court of the state in Wilson v. Beckwith, 117 Mo. 61, 22 S. W. 639, denied the validity of Allen's title obtained under the state's lien, and upheld the title under the trust deed to Moore, Wilson, and Waterman as paramount.

So this court is confronted with the suggestion that the decision in Wilson v. Beckwith, being the last expression of the highest court of the state, involving the proper construction of the legislative enactments of the state, is, on the doctrine of comity, binding and conclusive on the federal court, when the same question is again brought under review. No question is made by the court as to this being the generally accepted doctrine in the abstract. But, as applied to the history of this title and the facts of this case, a much deeper and broader question of sound public policy is presented. It is this: Involved in the construction of the state's mortgages and foreclosure sale thereunder are many thousand acres of land. For 21 years the decision of the state supreme court in Whitehead v. Vineyard, affirming the validity of the title to these lands acquired by Allen under the state's lien, stood unchallenged. This title was again reaffirmed by the supreme court of the United States 18 years prior to the decision in Wilson v. Beckwith. The decision in Whitehead v. Vineyard was again recognized, nem. con., by the state supreme court in 1879. In the meantime the lands under Allen's purchase have largely been sold and resold, and in increased degree, as shown by the evidence in this case, after the affirmation of Allen's title by the supreme court of the United States in 1875.

Shall this court now surrender its right of opinion, and disregard the solemn and considerate judgment of the supreme court of the United States, affirming the earlier ruling of the state court, and thereby unsettle the titles to all this property, which have reposed in recognized and confident security for so many years? It does seem to me that, if the doctrine of stare decisis is to have any place in the jurisprudence of this country, it ought to find a footing here and now. In Pease v. Peck, 18 How. 595, in discussing the state of case where a long-settled rule of action had prevailed, and between the time of an adjudication in the United States circuit court and the submission of the case on writ of error in the supreme court the supreme court of the state of Michigan had made a decision which was a departure, Mr. Justice Grier, in delivering the opinion of the court, said:

"There are, it is true, many dicta to be found in our decisions, averring that the courts of the United States are bound to follow the decisions of the state courts on the construction of their own laws. But although this may be a correct, yet a rather strong, expression of a general rule, it cannot be received as the enunciation of a maxim of universal application. Accordingly, our reports furnish many cases of exceptions to it. In all cases where there is a settled construction of the laws of the state, by its highest judicature, established by admitted precedent, it is the practice of the courts of the United States to receive and adopt it without criticism or further inquiry. But when this court have first decided a question arising under state laws, we do not feel bound to surrender our convictions on account of a contrary subsequent decision of a state court, as in the case of Rowan v. Runnels, 5 How. 139. When the decisions of the state courts are not consistent, we do not feel bound to follow the last, if it is contrary to our convictions; and much more is this the case where, after a long course of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines, subversive of former safe precedent. * * * Nor do we feel bound in any case in which a point is first raised in the courts of the United

States, and has been decided in a circuit court, to reverse that decision, contrary to our own convictions, in order to conform to a state decision made in the meantime. Such decisions have nor the character of established precedent declarative of the settled law of a state. Parties who, by the constitution and laws of the United States, have a right to have their controversies decided in their tribunals, have a right to demand the unbiased judgment of the court. The theory upon which jurisdiction is conferred on the courts of the United States, in controversies between citizens of different states, has its foundation in the supposition that possibly the state tribunal might not be impartial between their own citizens and foreigners. The question presented in the present case is one in which the interests of citizens of other states come directly in conflict with those of the citizens of Michigan. The territorial law in question had been received and acted upon for 30 years, in the words of the published statute. It had received a settled construction by the courts of the United States as well as those of the state. It had entered as an element into the contracts and business of men. On a sudden, a manuscript statute different from the known public law is disinterred from the lumber room of obsolete documents; a new law is promulgated by judicial construction, which, by retroaction, destroys vested rights of property of citizens of other states."

In Burgess v. Seligman, 107 U. S. 33, 34, 2 Sup. Ct. 10, the court says:

"When contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt. Acting on these principles, founded, as they are, on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication."

In Trust Co. v. Debolt, 16 How. 416–433, Chief Justice Taney, speaking of the contention that the construction given to the act of the state legislature by the state supreme court concluding the federal tribunals, draws a distinction between ordinary acts of legislation and matters growing out of contracts based upon a legislative act. Notwithstanding the state supreme court held that the state constitution did not authorize its legislature to make certain exemptions in the contract, yet, as it was in conflict with the uniform construction which had long prevailed in the state, the supreme court of the United States declined to follow it. Chief Justice Taney (pages 431, 432) said:

"It is true that this court always follows the decision of the state courts in the construction of their own constitution and laws. But, where those decisions are in conflict, this court must determine between them; and certainly a construction acted on as undisputed for nearly 50 years, by every department of the government, and supported by judicial decision, ought to be regarded as sufficient to give to the instrument a fixed and definite meaning. Contracts with the state's authority were made under it; and, upon a question as to the validity of such contract, the court, upon the soundest prin-

ciples of justice, is bound to adopt the construction it received from the state authorities at the time the contract was made. It was upon this ground that the court sustained contracts made in good faith in the state of Mississippi under an existing construction of its constitution, although a subsequent and contrary construction given by the courts of the state would have made such contracts illegal and void [citing Rowan v. Runnels, 5 How. 134]. The sound and true rule is that if the contract, when made, was valid by the laws of the state as then expounded by all the departments of its government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the state, or decisions of its courts, altering the construction of the law."

The mortgage in question here, made between the state and the Cairo & Fulton Railroad Company, was, in effect, a contract. For over 30 years the legislature itself construed this enactment as covering the lands of the company (Sess. Acts 1863–64, p. 382; Sess. Acts 1865–66, p. 107, § 6), as did the state supreme court for over 20 years, and the supreme court of the United States for 18 years, on the faith of which confiding purchasers have invested their money in the purchase of these lands. To disturb titles thus acquired, after so long repose, is both harsh and disruptive. The supreme court of the state has by precept taught a better doctrine than by the example set in Wilson v. Beckwith, supra. In Reed v. Ownby, 44 Mo. 206, 207, the court, through Judge Wagner, said:

"The law has been settled for many years. It has become a rule of property, and titles have been vested on the strength of it. Under such circumstances, the error would have to be most palpable to justify this court in overruling previous decisions. The stability of judicial decisions is of the utmost consequence, as upon them reposes the security of property, and they are not to be tampered with to suit the views of different persons."

And its last utterance in Dunklin Co. v. Chouteau, 120 Mo. 578, 25 S. W. 553, is:

"That decision was pronounced over 30 years ago. It thereby establishes a rule of property which has been acted upon during all that period of time, and as to these lands it ought to be followed, whether, in our opinion, the judgment then rendered is right or wrong."

Even in the case of a single decision, long acquiesced in, a rule of property may be created; and where there is a series of decisions, pointing one way, the rule established ought to be regarded as absolutely impregnable, where rights have been bottomed on them. Wells, Stare Decisis, § 598; 23 Am. & Eng. Enc. Law, p. 28, § 3. The reasonable limitation to the doctrine of stare decisis is that, when a decision can be used only as an instrument of wrong and destruction, then "error ceases to be sacred, and principles and truths ought to be reasserted." The application of the latest decision of the state supreme court to the title in question is, in my humble opinion, retroactive and unjust. The issues are found for the defendant. Judgment accordingly.