ROBERT M. WHITEHEAD, Defendant in Error, *v.* ALFRED VINE-
YARD, Plaintiff in Error.

1. *Railroads — Iron Mountain R.R. — State lien — Sale of after acquired*
   *lands under.*— The lien of the State upon the Iron Mountain Railroad lands,
   created by the act of 1851 (Sess. Acts 1851, p. 266 *et seq.*), embraced land
   acquired by the road after the creation of the lien, and foreclosure and sale
   of the road under said act would carry title to such land.
2. *Iron Mountain R.R., sale of — What lands appurtenances to road.*— The
   sale of the Iron Mountain Railroad and its appurtenances, under the act
   of February 22, 1851 (Sess. Acts 1851, p. 268, § 11), and acts pursuant
   thereto, embraced railroad land, although outside of the railroad and not
   necessary to its use. (See Sess. Acts 1865-6, p. 107, § 6.)

*Error to Second District Court.*

*Perryman & Dinning*, for plaintiff in error.

*Dryden & Dryden*, with *J. L. Thomas*, for defendant in
error.

BLISS, Judge, delivered the opinion of the court.

The plaintiff brings ejectment, and claims title through Thos.
Allen, who held the property as having belonged to the Iron
Mountain Railroad Company. It is not disputed that the plain-
tiff established his right to the land, provided the railroad com-
pany had a right to purchase and hold the same, and provided
it was included in the lien held by the State upon its property,
and sold to said Allen when the State sold out the road. The
District Court, in reversing the judgment of the Circuit Court,
held the affirmation of these propositions, and they are the only
questions presented for our review.

1. Section 1 of the charter provides that the company "may
take, hold, use, possess and enjoy the fee-simple, or any other
title or estate, in any lands, tenements or hereditaments, and the
same to sell and dispose of at pleasure," etc. (Acts of 1850–51,
in Sess. Acts 1850–51, p. 479, and R.R. Laws, 40 ; see also act
of 1864, in Sess. Acts 1863–4, p. 382, authorizing the company
to sell or lease its lands not needed for the use of the roads.)
It may be conceded that this power to hold and sell real estate·

should be held to be subordinate to the general objects of the corporation; still it is sufficient to pass title, and we need not now inquire further.

Upon the second inquiry, it is evident that the Legislature intended that the State should hold a lien upon all the property of the company, and that when it was foreclosed and the railroad sold out, and the title confirmed in said Allen, the sale was understood to cover everything which the company owned.　To this view it is objected:

First.　That the company did not own the land in dispute when the lien was created by statute, and that, therefore, it could not attach.　True, the land was an after-purchase, but the inference is a *non sequitur*.　If this were a sound view all the State liens for advances to build railroads would have been lost.　In every instance it was to take effect upon prospective property, and such was the contract between the State and the respective companies who have been aided.　This lien, for whatever it covered, was created by statutory contract referring to after-acquired property, and the statutory foreclosure afterwards made was expressly provided for by the acts under which the obligation was created.　It is analogous to a mortgage of property not *in esse*, but which can be reached in equity.

As to such property, Judge Story, in Mitchell v. Winslow, 2 Sto. 639, says that courts of equity "support assignments, not only of choses in action, but of contingent interests and expectancies, and also of things which have no present, actual or potential existence, but rest in mere possibility only.　In respect to the latter, it is true that the assignment can have no positive operation to transfer *in presenti* property and things not *in esse*, but it operates by way of present contract, to take effect and attach to the things assigned when and as soon as they come *in esse*, and it may be enforced as such a contract *in rem* in equity."　The controversy usually arises between the mortgagee and other creditors; and when there is no fraud, pledges of property not yet acquired have been uniformly sustained, as is shown in cases cited by counsel.

But the question is important in the present case only as

showing the intention of the Legislature; for if the several acts bearing upon the subject show that after-acquired property was intended to be embraced in the lien of the State, this objection falls to the ground. The legislative intention constitutes the law, and the law governs the lien.

It is urged, secondly, that this land was not included in the lien and sale because not covered by the statute. The first act, authorizing the loan of the credit of the State to the St. Louis & Iron Mountain Railroad Company, was passed December 25, 1852, and for the terms and conditions of the loan it referred to the act of February 22, 1851, "to expedite the construction of the Pacific and Hannibal & St. Jo. Railroads." (R.R. Laws, 109–10.) The act to which reference is thus made (R.R. Laws, 60–63) provides (§ 4) that the certificate of the acceptance of the State bonds shall operate as a mortgage of the road of the company, "and every part and section thereof and its appurtenances," and also (§ 11), in case of default, that the governor shall "sell their road and its appurtenances by auction." Afterwards (December 10, 1855) the State, in "An act to secure the completion of certain railroads in this State," granted, by section 4, more bonds to this company, "upon the condition of a first lien or mortgage as contained and reserved in the act of February 22, 1851." (R.R. Laws, pp. 73, 84, § 2.) Again, on the 3d day of March, 1857, an amendment to the last-mentioned act was made for the relief of the railroad companies therein named, including the Iron Mountain Railroad Company, by which they were required to file a certificate accepting its terms and providing (§ 17) that "all bonds issued under the provisions of this act shall constitute a first lien or mortgage upon the road and property of the several companies so receiving them, in the same manner as provided by the act approved February 22, 1851."

Under the provisions of these acts and subsequent legislation the railroad was sold out, and defendant claims that the land in controversy could not have been sold because not included in the term "appurtenances" used in the act of February 22, 1851; that land outside of and not necessary to the use of the road is not appurtenant to it. It becomes unnecessary in this case to

Whitehead v. Vineyard.

consider how much would be included in the term, had not the Legislative intention been otherwise made clear. Were we compelled to go into the questions it might become necessary to inquire into the object for which the land was acquired, whether it must be held subordinate to or might be acquired independent of the only object of the organization. But the act of March 7, 1857, giving further aid to the several railroad companies, and which was expressly accepted by them, not content with the term " appurtenances," uses the more unambiguous and sweeping phrase " the road and property of the several companies," etc.—unequivocally showing the intention to cover by the lien of the State all the corporate property of the companies named in the act. Subsequent acts expressly refer to and cover land like that in controversy, and leave the Legislative intention without a shadow of doubt. The act of February 15, 1864 (Sess. Acts 1863–4, p. 382), authorizes the St. Louis & Iron Mountain Railroad Company to sell and loan its lands not needed for the use and purposes of the road, and provides that their proceeds shall be paid into the State treasury on account of the interest due upon State bonds, and that the lien of the State upon such lands shall cease. Also the act of February 19, 1866 (Sess. Acts 1865–6, p. 107, § 6) provides that in the sale of the respective railroads the commissioners shall " award the roads, and every part and section thereof, their franchises and appurtenances, and all lands and other property, real and personal, to the highest and best bidders," etc.

This land, therefore, was included in the lien held by the State upon the property of the St. Louis & Iron Mountain Railroad Company, and passed by its sale as provided in the last mentioned act.

The judgment of the District Court, reversing that of the Circuit Court and remanding the cause, is affirmed. The other judges concur.