WILSON, *by Next Friend*, v. BECKWITH, *Appellant.*

In Banc, June 29, 1897.

140   359
147   151
78a  314
78a  644
140   359
165   670
140   359
173   444

1. **Notice**: RECITALS IN DEED OF TRUST.    A deed of trust to trustees recited on its face that the lands "were conveyed subject to a prior first and only lien in favor of the State of Missouri, to secure bonds issued to a railroad by the State, under and by virtue" of certain acts of the General Assembly.    *Held*, that such recital imparted notice of the State's prior lien to purchasers at the foreclosure sale and their grantees.

2. **Definition of "Property."**    Property is *nomen generalissimum*, and extends to every species of valuable right and interest, including real and personal property, easements, franchises and other incorporeal hereditaments.

3. **Stare Decisis**: LIMITATION OF ITS DOCTRINE.    The limitation of the doctrine of *stare decisis* refers only to cases which are alike in principle and in substance.

4. ———: AS TO CERTAIN CASES.    The court reviews the cases of *Whitehead v. Vineyard*, 50 Mo. 30, and *Wilson v. Boyce*, 92 U. S. 323, and finds that they construe the same words in the same mortgage as applied to the same railroad, and that they are in every other material issue *like* the one at bar, and therefore the doctrine of *stare decisis* is applied, and they are held to be decisive of this case.    The former judgment in this same case, *Wilson v. Beckwith*, 117 Mo. 61, in which an adverse ruling was reached, is overruled.

5. ———: NON-REVIEWABLE.    The court will not determine otherwise a question which by former adjucations has become so fixed as to establish a rule of property, after titles have become vested, and peaceable citizens have invested their money on the strength of it, even though such question may have been wrongfully determined.

6. **Meaning of Words in Statute.** The words "the road and property of the several companies," as used in the act of March 3, 1857, is held to mean, so far as it affects the Cairo & Fulton Railroad Company, that all the lands as well as the road and its appurtenances, belonging to said railroad company, were conveyed to the State in the mortgage which was afterward accepted by the president of the company in the manner as the act provided.

7. **Grant in Praesenti:** TRUSTS: CAIRO & FULTON RAILROAD MORT-GAGES. The act of Congress of February 9, 1853, beginning with the words "that there be and is hereby granted to the States of Arkansas and Missouri every alternate section," etc., was a grant *in praesenti*, and did not fasten upon the lands a trust so that they could not be sold and a legal title vested in the purchaser by the railroad company, although said act provided that the legislature might "dispose of the lands for the purpose of making a railroad and no other," and that said lands should be disposed of only when the Governor should certify to the Secretary of the Interior that twenty miles of said road had been completed, then one hundred and twenty sections within said twenty miles length might be sold. The act of Congress granted a present title in the lands to the State, and these lands passed at once to the State unimpressed with a trust or lien in favor of the United States. By the act of 1855 the legislature passed the same lands to the Cairo & Fulton Railroad Company, and aided the road with its bonds to the amount of $250,000, which were secured by a mortgage on the company's "road and its appurtenances," which did not include the land. By the act of 1857 the State aided the road with $400,000 more bonds, which were secured by a first lien on the "road and its property," which included these lands, and when this mortgage was foreclosed the purchaser got the entire title to the land.

*Appeal from St. Louis City Circuit Court.*—HON. LEROY B. VALLIANT, Judge.

REVERSED AND REMANDED *(with directions)*.

*Martin L. Clardy* for appellants.

(1) The fact that this case was retried in accordance with the principles announced in the decision of this court (117 Mo. 61) is no reason why the court should not review its former adjudication, and if it is manifest that the principles of law involved have been incorrectly decided and that great injustice will be done

to one of the parties by adhering to its opinion, reverse such decision and render the judgment that should have been rendered in the first instance. *Chambers v. Smith*, 30 Mo. 156; *Grumley v. Webb*, 48 Mo. 602; *Boone v. Shackelford*, 66 Mo. 497; *Bell v. Railroad*, 72 Mo. 50; *Eans v. Eans*, 79 Mo. 53; *Wernse v. McPike*, 100 Mo. 476; *Gwin v. Waggoner*, 116 Mo. 143; *Bird v. Sellers*, 122 Mo. 32; *Rutledge v. Railroad*, 123 Mo. 131. (2) The said acts of 1855 and 1857, having been passed before the execution of the trust deed, by the Cairo & Fulton Railroad Company, the purchasers from the trustees took and held subject to any lien which the State acquired under these acts. If, therefore, these acts, or either of them "covered this land, then the foreclosure sale made in 1866 cut out and utterly destroyed the title of those claiming under the deed of trust." *Wilson v. Beckwith*, 117 Mo. 73, 74; *Wilson v. Boyce*, 92 U. S. 325; *Foster v. Reynolds*, 38 Mo. 553; *Brant v. Robertson*, 16 Mo. 129; *Wolfe v. Dyer*, 95 Mo. 545; *Christian v. Newberry*, 61 Mo. 446; *Kansas City Savings Ass'n v. Mastin*, 61 Mo. 435. (3) All the questions arising in this case have been settled adversely to the plaintiff in the following well considered cases: *Whitehead v. Vineyard*, 50 Mo. 30; *Wilson v. Boyce*, 92 U. S. 320; *Chouteau v. Allen*, 70 Mo. 327; *Railroad v. McGhee*, 115 U. S. 476; *Wilson v. Ward Lumber Co.*, 67 Fed. Rep. 674. These decisions have become a rule of property, and titles have been vested upon the strength of such rule. The certainty of the rule is even more important than the reason of it; the maxim "*Stare decisis et non quieta movere*" is the only safe rule, and should be adhered to. Even one decision in regard to title will be scrupulously guarded and preserved. The titles are for all time, and should stand as passed upon, if possible. 23 Am. and Eng. Ency. of Law, art. "Stare Decisis," p. 21; *Harrow v. Myers*, 29

Ind. 470; *Reed v. Ownby*, 44 Mo. 206; Wells on Res Adjudicata and Stare Decisis, secs. 598, 599 and 611; *Dunklin County v. Chouteau*, 120 Mo. 577; *Smith v. Clark County*, 54 Mo. 70; 2 Hermann on Estoppel and Res Adjudicata, pp. 116, 117-123; *Wilson v. Ward Lumber Co.*, 67 Fed. Rep. 674.

*Harry J. Cantwell* and *A. N. Edwards* for respondent.

(1) Section 17 of the act of March 3, 1857, does not constitute the contract between the Cairo & Fulton Railroad Company and the State of Missouri. The act of February 20, 1855, the provision of section 20 of the act of March 3, 1857, the object to be attained by the advance of State aid, the then existing conditions, the contemporaneous construction by both parties, shall all be considered. *Wilson v. Beckwith*, 117 Mo. 61. (2) The object of all rules of interpretation is to discover the intent. When the terms of a law or contract are ambiguous the subject-matter and object of the statute is to be considered in construing it. *Wilson v. Beckwith, supra; Spitler v. Young*, 63 Mo. 44; *State ex rel. v. Diveling*, 66 Mo. 379; *Platt v. Railroad*, 9 Otto (98 U. S.), 48. (3) The act of February 20, 1855, authorizing the railroad company to mortgage the lands for funds to build the road was not repealed by the act of December 10, 1855, nor by that of March 3, 1857, and the act of March 3, 1857, must be construed with it. *Wilson v. Beckwith*, 117 Mo. 61; *McVey v. McVey*, 51 Mo. 406; *U. S. v. Gear*, 3 How. 120; *Ex parte Cow Dog*, 109 U. S. 556; *State v. Stoll*, 17 Wall. 425. (4) The subsequent declarations of the State that no lien was ever intended to be created on the lands are admissible, and effectual as a waiver of any lien the State ever had, if any, on these lands. *Brown and Brown*,

*Trustees, v. State of Maryland and Railroad*, 62 Md. 439; *State to use, etc., v. Heman*, 70 Mo. 441. (5) Now the Constitution of 1865 (Const. 1865, sec. 15, art. 77) prohibited the legislature from releasing the lien of the State upon any railroad. The "sell out act" declared the purchasers should not acquire the "swamp" lands at said sale. If the "congress" lands were included in the lien of the State, then the "swamp" lands surely were, for they are "property" in an equal degree. (6) The contract between the State and the railroad company did not become consummate until the issuance of the bonds in April, 1859. *Trustees v. Rider*, 13 Conn. 87; *Town of Concord v. Portsmouth*, 92 U. S. 625; *Tilley v. Chicago*, 103 U. S. 155; *Ellison v. Henshaw*, 4 Wheat. 225; *Bank v. Hall*, 101 U. S. 43. (7) The word "property" has no fixed meaning. It may, when used in a will—to take effect after a man has no further use for "property"—be sufficient to include all he was possessed of, but it can only be construed to have that effect in other instances when there is no other evidence to limit the sense in which it was used. *Wilson v. Beckwith*, 117 Mo. 61; *Alabama v. Montague*, 107 U. S. 602; *Smith v. McCullough*, 104 U. S. 25; *Myer v. Johnson & Stewart*, 53 Ala. 237, and 64 Ala. 603; *Dinsmore v. Railroad*, 12 Wis. 649; *Seymour v. Railroad*, 25 Barb. 284; *Railroad v. Livermore et al.*, 47 Pa. St. 465. (8) Act of Congress of July 28, 1866, was a waiver of forfeiture and not a new grant. The selection under the act of February 9, 1853, and not the issuance of the patent vested the title. *Doe v. Laramore*, 116 U. S. 198; *Railroad v. McGee*, 115 U. S. 469; Act of Congress, June 10, 1852. (9) "*Stare decisis*" means to adhere to and abide by the decided law (Bouvier). Not to decided facts, but to decided law. 1 Kent, *477, and cases cited in first clause of appellant's brief.

GANTT, J.—This is an action of ejectment for the possession of forty acres of land, the northwest quarter of the southeast quarter of section 10, township 26, range 16, situate in Mississippi county in this State. The action was originally commenced in said county and a change of venue awarded to the city of St. Louis. This is the second appeal in the cause to this court. The defendant recovered judgment on the first trial in the circuit court of St Louis and that judgment was reversed and the cause remanded by Division number 1 of this court. The opinion then rendered will be found in 117 Mo. 61. On the last trial plantiff recovered and defendant appealed. As was said by BLACK Judge, on the former appeal, the importance of the questions involved demand a clear and full statement of the facts. The forty acres directly involved in this appeal constitute but an insignificant part of the large domain the title to which will be affected by our decision. The essential facts are as follows:

On the ninth of February, 1853, Congress passed an act (10 U. S. Stats. at Large, p. 155), granting to the State of Arkansas and Missouri a right of way though the public lands for a railroad, from a point on the Mississippi river, opposite the mouth of the Ohio, to Fulton on the Texas boundary, by the way of Little Rock; also granting to said States, respectively, every alternate section of land, designated by even numbers, for six sections in width, on each side of the road "for the purpose of aiding in making the railroad and branches as aforesaid," and providing that the legislature might dispose of the lands "for the purposes aforesaid, and no other."

Section 5 provides: "That the lands hereby granted to said States shall be disposed of by said States only in the manner following; that is to say, that a quantity of land not exceeding one hundred and twenty

sections, and included within a continuous length of twenty miles of said road, may be sold; and when the Governors of said State or States shall certify to the Secretary of the Interior that twenty continuous miles of said road is completed, then another like quantity of land hereby granted may be sold; and so from time to time, until said road is completed; and if said road is not completed within ten years, no further sales shall be made, and the land unsold shall revert to the United States.''

On the twentieth of February, 1855, the legislature of this State, passed an act (Acts 1854, p. 314), granting to the Cairo & Fulton Railroad Company, a corporation organized under the laws of this State, the lands granted to this State by the act of Congress aforementioned, ''for the uses and purposes, and subject to the condition, reversion, and provisions set forth and contained in said act of Congress and this act.'' The act contains the following section:

''SECTION 5. For the purpose of raising funds from time to time, for the construction of the said railroad, the said company may sell the said lands, in the manner provided for by the said act of Congress, and may issue their bonds in such sums as they may deem proper, at rates of interest not exceeding seven per cent per annum, payable semiannually, and the principal of said bonds, payable at such time and place as they may designate; and may secure the payment of said bonds by mortgage of said lands, or any part thereof, to be executed by said company, and may make the said bonds convertible into land or stock of the company within such periods as they may prescribe; *Provided*, further, that nothing in this act contained shall be construed to authorize said company to sell, dispose of, or apply the said lands, or the proceeds thereof, in any other manner, or to any other purpose,

than as required and limited by the said act of Congress."

The act of Congress provided that if it should appear, when the road was located, that the United States had sold any of the lands granted to the State, the State might, by an agent appointed by the Governor, select other lands in lieu thereof. There were some twelve thousand, eight hundred and eighty-seven acres of vacant even numbered sections of land which passed to the State by the act of Congress, the parcel of land in suit being a part hereof and within the first twenty-mile section of the road which was constructed.

By the act of the eleventh of December, 1855, (local Acts 1855, p. 469), the legislature provided for issuing State aid bonds to the Cairo & Fulton Railroad Company to the amount of $250,000 and provided that no part of the bonds should be delivered until the company signified its acceptance by filing a receipt for the bonds with the Secretary of State. Section 3 of this act is as follows:

"SECTION 3. Each certificate of acceptance so executed and filed, as aforesaid, shall be recorded in the said office of the Secretary of State, and shall thereupon become and be, according to all intents and purposes, a mortgage of the road, and every part and section thereof and its appurtenances, to the people of this State, for securing the payment of the principal and interest of the sums of money for which such bonds shall, from time to time, be issued and accepted, as aforesaid."

On the twenty-ninth day of June, 1857, the president of the road filed with the Secretary of State a certificate showing the acceptance by the railroad company of the provisions of the act of December 11, 1855.

Bonds were issued under this act, and receipts filed

therefor, to the amount of $250,000, in August, October and December, 1857.

On the third day of March, 1857, the legislature passed another act (Laws of Missouri 1856,1857, p. 85), extending State aid to five or six railroad companies by a loan or guaranty of bonds, including therein an additional loan of $400,000 to the Cairo & Fulton Railroad Company. Section 17 of the act is as follows:

"Section 17. All bonds issued under the provisions of this act *shall constitute a first lien or mortgage upon the road and property of the several companies so receiving them*, in the same manner as provided by the act approved February 22, 1851, 'to expedite the construction of the Pacific Railroad, and of the Hannibal & St. Joseph Railroad, and the act approved December 10, 1855, of which this is amendatory."

On the nineteenth day of October, 1857, the president of the road filed his certificate, accepting on the part of the company the provisions of the act of March 3, 1857. Section 15 of this act provides that, in the event of a failure on the part of the company to pay any part of the princpal or interest on the bonds of the State, issued under the act, the Governor should take such steps as might be deemed necessary and proper to foreclose the mortgage of the State and enforce its lien on the property of the company. The bonds referred to in the act of March 3, 1857, were issued and accepted by the railroad company.

The Cairo & Fulton Railroad Company having made default in the payment of the State aid bonds, the legislature passed two acts—one on the nineteenth of February, 1866, and the other on the nineteenth of March, 1866—directing the Governor to foreclose the State's lien, and providing for a board of commissioners to bid in the property and giving the commissioners power to sell the property so purchased, reserving,

however, from sale the land subscribed by counties to the stock of said road, in the following language: "Section 8 [Act of December 11, 1855]. That nothing in this act shall be so construed as to convey, or to authorize the commissioners to convey to the purchasers of the Cairo & Fulton Railroad any of the lands subscribed by counties to the stock of said road." The lands referred to in this section, known as "swamp lands," to distinguish them from "Congress lands," to which latter class the tract of land in suit belongs, were excepted from the operation of the act, presumably because the counties subscribing them to the capital stock of the railroad company disputed the legality of such subscriptions.

In pursuance of these acts, and the powers contained therein, the Governor, by deed dated the twelfth of October, 1866, sold and conveyed to the State "said Cairo & Fulton Railroad, and every part and section thereof, so far as the same is constructed, completed or projected, together with its appurtenances, rolling stock, and property of every description, and all rights and franchises thereto belonging." Afterward, the State, by a like description, conveyed the property to Read, Mackay, Vogel and Simmons, by deed dated January 17, 1877, and they, by a like description, conveyed the property to Thomas Allen. Title to the property passed from Mr. Allen to the Cairo, Arkansas & Texas Railroad Company. That company and the St. Louis & Iron Mountain Railroad Company consolidated under the name of the St. Louis, Iron Mountain & Southern Railway Company, and the last named company conveyed the land in suit to defendant, Thomas Beckwith, by deed dated February 17, 1882.

The plaintiff claims title as follows: The Cairo & Fulton Railroad Company, by a trust deed, acknowledged on the thirtieth of April, 1858, conveyed to John

Moore, John Wilson and Albert S. Waterman, some four hundred thousand acres of land, including the land in suit, and the roadway, stations, depots and engine houses of the railroad company to secure bonds of the company to the amount of $1,600,000. This deed authorizes the trustees to sell the lands conveyed to them, for cash, or for part cash and part credit, or for bonds of the company, the cash to be used in the purchase of bonds. It declares the duty of the trustees to be to cancel the bonds when purchased or taken for land, and to execute to the purchasers deeds, which latter shall operate as a discharge of the lien of the deed of trust thereon. The trustees conveyed the land in question, with other lands, to one Hamilton, by deed dated in November, 1859. Hamilton sold the lands to Stevens, and the latter conveyed the same to Blakely Wilson, by deed dated in 1860. Wilson died in 1876, leaving a will whereby he devised all his lands to his son, Edward, who died, leaving the plaintiff as his only heir.

I. We are urged to reconsider and overrule the opinion announced on the former appeal in this case. In view of the gravity of the question involved and the consequences that must follow our adherence to the ruling therein made, we have thought it proper to examine again the reasoning upon which that decision is based. In so doing we inaugurate no new practice in this court. In the recent case of *Bird v. Sellers*, 122 Mo. 32, the title to certain real estate was in dispute and the revenue law of the State was under consideration, and it appeared that the same matter had been decided by the second division of this court, but the first division came to a contrary conclusion, and BRACE, Judge, speaking for the court said: "Although the general rule is that whatever has been once passed upon

here on appeal will in the same case upon a second appeal be treated as no longer open to dispute or further controversy, yet this is not an inexorable rule without exceptions, but has been frequently departed from, when such adjudication has been found to be wrong, not in harmony with other decisions of the court, and no injustice or hardship would result from overruling the former decision.''

In the still more recent case of *Rutledge v. Railroad*, 123 Mo. 131, it was said by BARCLAY, J., for the court *in banc:* ''There is *no* immutable fiat of jurisprudence forbidding a change of rulings on a second appeal. One decision may discard a rule of law announced in another. Courts of last resort occasionally find it proper and just to overrule, and thus correct their former declarations of legal principles. It sometimes is a matter of congratulation that justice can be finally done, in that manner, in the same cause, on a later appeal when necessary.''

Inasmuch then as this case involves a question of title that may and probably will affect the ownership of at least ten thousand acres of land similarly situated, and the litigation has been kept alive during all the time that has elapsed since the former opinion, it can not with much confidence be asserted that it has been accepted, or acquiesced in, so as to have become a rule of property, certainly not one of very long standing. Few titles, under the circumstances, can reasonably be presumed to have been acquired on the strength of the opinion rendered on the former appeal.

Of the three important points decided in the former appeal only one is challenged at this time. Indeed, as to the first two paragraphs of that opinion, we deem these propositions incontrovertible, viz., that all persons claiming title to lands under and through the deed of trust from the Cairo & Fulton Railroad Company to

the trustees, Moore, Wilson, and Waterman, took and held the same subject to any lien which the State acquired by the acts of the General Assembly of Missouri of December 11, 1855, and March 3, 1857, passed in aid of the building of said railroad, since both of said acts were enacted *prior to the execution of said deed of trust* to said Moore, Wilson and Waterman.

The conveyance to said trustees on its face recited that *said lands were conveyed to them subject to a prior, first, and only lien* in favor of the State of Missouri to secure the bonds issued to said railroad by the State, under and by virtue of said acts of 1855 and 1857. Notice of said lien was thus imparted by the recitals upon the face of the instrument through which they deduce their titles. Equally well settled is the other conclusion reached in the second paragraph of the opinion that by the words "the road and every part and section thereof and its appurtenances," in the act of December 11, 1855, the "Congress lands" were not included, and the State by that act did not acquire a lien upon said lands. They were not in a legal sense *appurtenant to the railroad*, but were independent property not necessary or even convenient to its operation.

II.   Concurring up to this point with the views expressed on the former appeal, we are confronted with the claim that in the third paragraph of that opinion this court misinterpreted the language of the act of March, 1857, which provided that "all bonds issued under the provisions of this act shall constitute a first lien and mortgage *on the road* and property of the several companies, etc." Act 1857, sec. 17. This court held that these general words, "the road and property of the companies" did not, and were not intended to embrace lands patented by the United States to the State of Missouri by the act of Congress of 1853, "for the purpose of aiding in construction of

a railroad from a point in Missouri opposite the mouth of the Ohio river, by way of 'Little Rock, Arkansas, to the Texas boundary line near Fulton in Arkansas.''

We approach the examination of the reasoning which forms the basis of the construction placed upon the foregoing language in no egotistical or critical spirit. It is the purpose of the writer so far as in him lies to calmly consider the contention of counsel for appellant that the opinion of this court on the former appeal is irreconcilable with former adjudications of this court and the Supreme Court of the United States construing these identical words. If we arrive at a different conclusion it will be because we believe the language and spirit of the statute are not susceptible of the meaning ascribed to it by the learned judge who wrote that opinion, and with no desire to detract in the least from the weight of his decisions which have earned for him a most enviable position as a jurist.

The statute of 1857 secures to the State a first lien and mortgage ''on the road (railroad) and property'' of the Cairo & Fulton Railroad Company.

Property is *nomen generalissimum* and extends to every species of valuable right and interest, including real and personal property, easements, franchises, and other incorporeal hereditaments. 19 Am. and Eng. Ency. of Law, pp. 284 and 285.

This is conceded by the opinion. Says the learned judge, ''Property, when unrestricted, includes every class of property which a man can own, but it is generally used in a less comprehensive sense.'' Unquestionably the term may be restricted and often is by the context. Unless then the words ''on the road and its property'' are so associated with other words which taken as a whole indicate that it was the intention of the legislature not to take a lien upon the railroad and its other property it must be conceded they are com-

prehensive enough to include these lands.  On the former appeal it was argued by the defendant, as it is now, that these words in this particular statute had already received judicial interpretation by this court, and following the course of the opinion we stop to inquire how that contention was met.  Says the court through BLACK, P. J.: "The question as to what lands *these words covered* came up for consideration in *Whitehead v. Vineyard*, 50 Mo. 30.  In that case the plaintiff (in ejectment) claimed title under Thomas Allen, who claimed under a sale of the Iron Mountain Railroad, the sale having been made to foreclose the State's lien created by the act of 1857, *the same law now in question*.  It was there said that the sweeping phrase 'the road and property of the several companies' showed an intention to cover by the lien of the State *all the corporate property of* the companies, and the plaintiff prevailed.  It does not appear from the report of the case *how, or for what purpose, the company acquired the land*.  It seems certain, however, that the company did not acquire it by any land grant to aid in the construction of the road, as is the case here."

Again, on the former appeal the defendant urged that the Supreme Court of the United States in *Wilson v. Boyce*, 92 U. S. 323, had these same words of this same statute before it for construction in a case in which the plaintiff deraigned title through the Cairo & Fulton Railroad Company's deed to Moore, Wilson and Waterman, being the same deed under which the plaintiff herein claims title, the plaintiff in that case being the grandfather of plaintiff in this case, through whom she claims title.  The defendant in that case claimed title through the mortgage created and reserved by the State by the act of 1857, and the "sell out" act of 1866.  Says this court through BLACK, P. J.: "Speaking of the descriptive words in the aid act of

1857 the court (i. e., Supreme Court of the United States) held that the generality of the language formed no objection to the validity of the statutory mortgage; and it was also considered that the difference between the language of the act of 1855 and that used in the act of 1857, showed an *intended extension* of the security taken by the State." "The title under the State's lien prevailed over that under the deed to the trustees. The court cited with approval the case of *Whitehead v. Vineyard.*   Both of these cases (i. e., *Whitehead v. Vineyard,* 50 Mo. 30, and *Wilson v. Boyce,* 92 U. S. 323) were cited with approval in *Chouteau v. Allen,* 70 Mo. 290–327." So that it is obvious that this court was advised that this court, in two cases, and the Supreme Court of the United States in one, had judicially determined that the words *"road and property of the several companies" included "the Congress lands"* granted to said Cairo & Fulton Railroad by the State of Missouri, and was asked to recognize the doctrine of *stare decisis,* but the learned judge who wrote the opinion, notwithstanding his clear apprehension of what those cases decided, held that the doctrine of *stare decisis* was improperly invoked in this case because they were not "like cases," that in fact this court and the Supreme Court of the United States only decided "that the words 'the road and property of the companies,' *standing alone,* included land owned by the company whether appurtenant to the road or not."

Deferring for the present any discussion as to the soundness of *Whitehead v. Vineyard* and *Wilson v. Boyce,* upon the fact of each, we must pause to consider whether the case at bar is "a like case" to those cases.   We agree with the learned judge that the limitation of the doctrine of *stare decisis* to "like cases," refers only to cases which are alike in principle, or in substance.

The point of decision in *Whitehead v. Vineyard* was "What property was embraced in the statutory mortgage created by the act of 1857, under the designation, the road and property."

In every conveyance, whether by way of absolute grant, or by way of security for the payment of money, or performance of some collateral agreement, the estate or thing conveyed is of prime importance, and in the development of this branch of jurisprudence certain formulas of expression have grown to be recognized as essential and as defining in a few words the effect of the conveyances in which they are used. When such words have received judicial sanction they have been afterward adopted by the legal profession and conveyances and in no department of legal science has more conservatism been displayed than in adhering to such technical expressions. Thus the word "heirs" became in time absolutely necessary to the creation or transfer of an estate in fee by deed. And when in this and other states it was deemed unnecessary, the remedy was applied by the legislature and not by the courts. Likewise the words necessary to pass an estate tail having been judicially ascertained were scrupulously guarded in subsequent cases by the courts. Chamberlain, in his essay on *stare decisis*, recalls that in *Coulson v. Coulson*, 2 Strange, 1125 (13 Geo. 2), where the question was, what words pass an estate tail, it was held by the King's Bench that upon the facts of the case this was an estate tail in the grandson. In the subsequent case of *Hodgson v. Ambrose*, 1 Doug. 341 (20 Geo. 3), Lord Mansfield stated that Lord Hardwick had told him that he was dissatisfied with the decision in *Coulson v. Coulson* "but that he thought it was not now to be shaken," yet in *Hodgson v. Ambrose*, Lord MANSFIELD said: "Whatever our opinion might be upon principle and authorities, if the point were new, we all

think that since this is literally the same case with *Coulson v. Coulson,* and that has stood as law for so many years, it ought not now be litigated again.'' And yet as Chamberlain correctly says, when we compare the two cases it seems plain that Lord MANSFIELD could only have meant that the point of law was substantially the same in each and not that the other facts were literally the same. We say this much by way of premise to the discussion of what constitutes a like case in order to invoke *stare decisis.*

What if any similarity exists between the facts in this case and those in *Whitehead v. Vineyard, supra?* The cases are each in ejectment. In *Whitehead's* case his title depended entirely upon the superiority of the State's lien under the act of 1857. It was not disputed that he had the title provided the land was included in the State's lien on the Iron Mountain Road by the use of the words *"the road and property of the companies,"* and was subsequently sold to Thomas Allen under the "sell out" act of 1866. In this case, the defendant's title stands undisputed if the *same words, in the same act,* secured to the State a lien on the property of the Cairo & Fulton Railroad. In each case the State had issued its bonds to aid said railroad and had reserved this lien. A stronger parallel case could hardly be conceived. Standing thus, can it be doubted that the first case furnished a binding precedent in the same jurisdiction if the doctrine of *stare decisis* is not to be wholly ignored? In the former opinion of this court in this case, *Whitehead v. Vineyard* was not overruled, but it was sought to distinguish it from this case on the ground that it did not appear *"how"* the Iron Mountain obtained its outside lands, whereas in this case it did appear that these lands were granted to the State of Missouri by an act of Congress to aid in the construction of a railroad. But can it change the

\*significance of the operative words of a conveyance of property because it appears that the grantor as to one tract of land therein conveyed, derived title by deed from "A." and to another tract therein, by will from C.? Would not the conveyancer use the same words to convey the grantor's title in the one tract, as in the other? Perhaps we do not fully appreciate the meaning sought to be conveyed by this suggestion twice repeated in the opinion that it did not appear in *Whitehead v. Vineyard* "how" the Iron Mountain obtained title to the lands upon which this court in that case held that the act of 1857 gave the State a prior and first lien by the use of the words "road and property." Unquestionably it is true that the Iron Mountain did not have any Congress lands at that time. But that was not thought to be the point for decision but rather, did the words of the statute cover all its property from whatever source derived? And this court held it did, and that is the question in this case, and we hold that no two cases upon the unquestioned facts could be more "alike" and we are greatly relieved to find that the learned judge, who wrote the opinion on the former appeal herein, himself concedes that so striking and so clear is the similarity of the facts of *Whitehead v. Vineyard* and *Wilson v. Boyce* with those of this case that to use his expression: "We shall take it as settled law that the words of the aid act of 1857 before quoted include the land here in suit, *unless it is excluded* by force of prior legislation. To the extent that the prior acts qualify the general language of the act of 1857, *to that extent Whitehead v. Vineyard and Wilson v. Boyce* are not in point here, and to that extent this is not a like case." Recognizing, it would seem, that those cases were controlling unless their force and authority could be limited, or destroyed as precedents by demonstrating that they were not "like

cases" to this, the learned judge says: "The point of law decided was that the words *'the road and property of the companies' standing alone,* included land owned by the company, whether appurtenant to the road or not." And again: "It is evident to our minds that it was presented to the court so as to call for a consideration of those words *just as if they stood alone."*

Recurring to the report of *Wilson v. Boyce,* 92 U. S. 320, we find that Messrs. Isaac W. Scudder and H. A. Clover represented the plaintiff in error, Wilson, in the Supreme Court of the United States, and in their brief as digested by the reporter this language occurs: "A construction which would extend the lien of the State *over the lands* not in any way connected with the operation of the railroad, so as to divest the title of the plaintiff in error, a *bona fide* purchaser for value, is against the purpose and design of the grants made by Congress to Missouri, and also against the clear intention of the legislature of that State when it transferred the lands to the Cairo & Fulton Railroad Company." "These grants were made that the lands embraced by them should be sold, and the proceeds applied *to the construction of a work of internal improvement."* The act of 1855 was referred to in direct terms in the further course of said brief. Can it be made clearer by printed language that the acts of 1855 (Laws of Mo. 1854, 1855, p. 314) and the act of Congress of February 9, 1853, 10 U. S. Stats. 155, were relied upon by plaintiff in error to reverse the decision of the circurt court of the United States for the Eastern District of Missouri? And the Supreme Court responding to this contention used this language: "The plantiff's title arises in this manner: The lands, *in pursuance of authority given* by the statute of Missouri, were conveyed by the Cairo & Fulton Railroad Company to trustees, to be sold to raise

money for the construction of their road. This conveyance was dated May 23rd, 1857. On the 25th of November, 1859, the trustees conveyed the land in question to Hiram S. Hamilton, from whom Wilson, the plaintiff, derives title. The question is, which of these is the better title?'' Now it is clear that the Supreme Court had before it a statute of Missouri granting these lands to the Cairo & Fulton Railroad Company to be sold by it to raise money to construct its road. Will it be pretended that there was any other act except of that of February 20, 1855, which made such a grant? If not, how can it be maintained that the Supreme Court of the United States was betrayed into the construction of the statutory mortgage of March 3, 1857? On the contrary, is it not perfectly apparent that instead of permitting the court to look at the words of the act of 1857 alone, the learned counsel for the plaintiff in error invited the court's attention to the act of Missouri, February 20, 1855, which granted these lands to the railroad company, and urged and pressed upon the court that the act of Congress of 1853, while granting the lands to the State, ''prescribed a particular manner for the sale of the lands as the work progressed and that they *should be applied in no other way.''*

We are entirely unable to see how it can be said that the Supreme Court of the United States did not consider the act of Congress granting the lands to Missouri and did not consider the act of the legislature of Missouri which granted the lands to the railroad company. We are unable to conceive how that great court could have more clearly or fairly met the issue as to the respective titles of Wilson and Boyce than it did in that case. So that the premise assumed that this case on the former appeal was not ''a like case'' to *Wilson v. Boyce* because the Supreme Court of the

United States did not have the prior act of the legisla-
ture of Missouri of 1855 and the act of Congress of 1853
before it, is, in our candid opinion, without the shadow
of a claim upon which it can be made to stand.    The
premises failing, the sequence falls with it, and *White-
head v. Vineyard*, and *Wilson v. Boyce* stand unshaken
as deliberate judgments of this court, and the Supreme
Court of the United States, settling the title to the
lands acquired under the State's lien created and re-
served by the act of March 2, 1857, and such was the
decision of this court in *Chouteau v. Allen*, 70 Mo. 290,
where it was said:   "So far as respects 'the Congress
lands' described in the deeds of trust, it has been held
that they passed in consequence of the sale which
occurred October 1st, 1866, and which was but the
foreclosure of the first lien and statutory mortgage
held by the State over all the property of the com-
pany."    *Whitehead v. Vineyard*, 50 Mo. 30; *Wilson v.
Boyce*, 92 U. S. 320.    So that the court in *Whitehead
v. Vineyard*, 1872, held that the words "road and prop-
erty of the companies" embraced all the property of
the company and included lands belonging to the rail-
road whether appurtenant or not.    In 1875 the Su-
preme Court of the United States, construing not only
the *same* words, in the *same* mortgage, but as applied
to the *same* railroad now under consideration, followed
the construction put upon those words by this court
and with all the provisions of previous acts pressed
upon its attention, held that the lien of the State cov-
ered these lands now in dispute.    In 1879, the same
question again arising in this State upon a review of
those cases, this court set its approval upon both of
said decisions and declared that the question whether
these Congress lands were covered by the lien of 1857
was settled; that said lands were subject to said lien
and passed to Thomas Allen by the sale under the acts

of February 19 and March 19, 1866, known as the "sell out acts." Laws 1866, p. 107. Bearing in mind that up to this time the matter for decision now by this court is whether the statute of 1857 as to the State's lien upon this land has been construed by this court and by the Supreme Court of the United States and not whether the cases of *Whitehead v. Vineyard*, *Wilson v. Boyce*, and *Chouteau v. Allen* were exhaustively considered and correctly decided, we hold that those cases themselves settle beyond the peradventure of a doubt that in each and all of them the judicial mind was directed to the exact question now before us and that it was decided adversely to the plaintiff's claim herein.

Having reached this conclusion it necessarily follows that in our opinion the decision of this court on the former appeal was wrong in not following those decisions rendered, one twenty-one years, and another eighteen years, before the decision of this court on the former appeal.

No court is more firmly committed to the doctrine of *stare decisis* than this court. In *Reed v. Ownby*, 44 Mo. 206, this court, through WAGNER, J., said: "The question is firmly settled in this State by two direct adjudications, holding that an unrecorded deed is good against a judgment if recorded before an execution sale under the judgment." *Davis v. Ownsby*, 14 Mo. 170; *Valentine v. Havener*, 20 Mo. 133.

"The counsel for the plaintiffs admits these authorities are directly against him, but asks this court to review the question and determine the law otherwise. This we are not at liberty to do. The law has been settled for many years; it has become a rule of property, and titles have been vested on the strength of it. The stability of judicial decisions is of the utmost consequence, as on them reposes the security of property;

and they are not to be tampered with to suit the views of different persons.''

In *Dunklin County v. Chouteau*, 120 Mo. 578, referring to Judge LEONARD's opinion in the case of *Dunklin Co. v. Dunklin Co. Court*, 23 Mo. 449, BLACK, P. J., said: "That decision was pronounced over thirty years ago. It thereby established a rule of property which has been acted upon during all that period of time, and as to these lands it ought to be followed, whether in our opinion the judgment then rendered is right or wrong.''

Similar expressions of the rule can be found throughout the judicial history of this State and in no case in our opinion will the facts present a stronger reason for the application of this salutary doctrine than this record presents for maintaining the law as announced in *Whitehead v. Vineyard, Wilson v. Boyce,* and *Chouteau v. Allen* upon the construction of the act of March 3, 1857.

If no other reason could be adduced, *upon this ground alone* we think the decision in this case on the former appeal should be overruled and the judgment of the circuit court rendered in obedience thereto reversed.

III.   But we are by no means disposed to hold as an original proposition that this court erred in its decision in *Whitehead v. Vineyard*, 50 Mo. 30, nor that the Supreme Court of the United States mistook or misapplied the law in *Wilson v. Boyce*, 92 U. S. 320.

To clearly apprehend the reasoning of this court on the former appeal the lines upon which it proceeds must be kept in view.   Says the learned judge who wrote the decision: "We shall take it as settled law that the words of the aid act of 1857 before quoted, include the land here in suit unless it is excluded by force of prior legislation.''   He then states that the

act of Congress of 1853 donated these lands to the
State of Missouri to be disposed of and the proceeds
used in building a railroad from a point in Missouri on
the Mississippi river opposite the mouth of the Ohio
river to Fulton in Arkansas on the Texas boundary,
and that the said act provides that the State shall
dispose of the lands so granted in the manner and
only in the manner therein pointed out. He then
points out that the State of Missouri granted these
same lands to the Cairo & Fulton Railroad for the
same purpose and subject to the same conditions. He
refers to the provisions of section 5 of the act of Con-
gress, providing that one hundred and twenty sections
might be at once sold, and when the Governor certified
that twenty miles of the road had been completed, then
another like quantity of land might be sold and so on
from time to time, until the road was completed, and
if not completed in ten years, no more should be sold,
but the land should revert. He points out that the
same conditions were imposed upon the railroad by
the act of 1855. From these provisions the learned
judge deduced the result that by these acts a trust was
impressed upon these lands and that the completion
of the subsequent sections of the road of twenty miles
each, and the certificate of the Governor thereto were
conditions precedent to the power of the State to sell
these lands; citing, *Farnsworth v. Railroad*, 92 U. S.
49; that the lands were in the hands of the company
subject to the same trust as if they had remained in
the State, namely, to be disposed of and the proceeds
used in the construction of the road and full power
was conferred to sell and mortgage by the act of 1855.
It is then said that there is nothing in the act of 1857
which professes to amend, repeal or modify the act
of 1855. Upon these premises and these alone the
learned judge argues that if the legislature intended

to extend the lien over these lands, so permitted to be sold by the act of 1855, it would have in direct terms modified the act of 1855, and argues further that by this last act it could sell the land to get proceeds to build the road but for no other purpose, that is to say, we assume, could not borrow $400,000 of the State, and give the State a lien on said lands for that sum. The learned judge then asks: ''Can it be said that the acceptance of the act of 1857 abrogated the prior contract? And that is what must be said if we extend the State's lien over these lands, for it is manifest the lands could not be used, as in the act of 1855 contemplated, with a lien of $400,000 upon them.''

Let us now examine these premises. Did the act of Congress of 1853 fasten upon these lands a trust so that they could not be disposed of by the State for any other purpose? We think most clearly not. In the case of *Railroad v. McGee*, 75 Mo. 522, this act of Congress was before this court for construction and it was held to be a grant *in praesenti* and that the issuance of a patent was unnecessary to vest in the State a legal title to the lands therein designated; that the cases of *Gibson v. Chouteau*, 13 Wall. 92, and *Smith v. Madison*, 67 Mo. 694, were not applicable to such a grant.

In *Dunklin County v. Dunklin County Court*, 23 Mo. 449, construing a like grant of swamp lands for the purpose of reclaiming them, Judge LEONARD, speaking for the court, said: ''The trust reposed by the United States is in the State of Missouri; *it is a personal trust* in the public faith of the state, *and not a property trust*, fastened by the terms of the grant *upon the land itself*, and following it into whosesoever hands it may pass. It is proper, however, here to remark in vindication of the State, that the original grant by the United States contemplates, of course, a sale of the

land, in order to render it available for the purposes of the trust, and it is not to be supposed that this State will be guilty of a breach of her good faith by applying the stock for which the land is sold to any other purpose, without the consent of the United States. But however that may be, it is a matter exclusively within the control of the legislature."

In *Pool v. Brown*, 98 Mo. 675, this principle is approved and reasserted.

The language of the act of Congress of February 9, 1853 (10 U. S. Stats. at Large, 155), is "that *there be and is hereby granted* to the States of Arkansas and Missouri every alternate section," etc. In *U. S. v. Railroad,* 146 U. S. 570, these words "there be and hereby is granted," again came before that court for construction and they were held to be a grant *in praesenti*. Mr. Justice BREWER quoted Mr. Justice FIELD's language in *Railroad v. Northern Pacific*, 139 U. S. 1, as follows: "As seen by the terms of the third section of the act, the grant is one *in praesenti; that is, it purports to pass a present title to the lands designated by alternate sections."  .  .  .  "The language .  .  . implies that the property itself is passed, not any special or limited interest in it." "The words also import a transfer of a present title, not a promise to transfer one in the future." See, also, *Schulenberg v. Harriman*, 21 Wall. 44; *Railroad v. U. S.*, 92 U. S. 733; *Railroad v. Baldwin*, 103 U. S. 426; *Wunderlich v. Spradling*, 121 Mo. 364. In *Whitney v. Morrow*, 112 U. S. 693, it was said a direct legislative grant of public lands is the highest muniment of title and is not strengthened by a subsequent patent to the same land.

In the light of these authorities we think the learned judge was in error when he held that the construction of twenty miles of road and a certificate thereof by the

Governor were conditions precedent to the power of the State to sell the lands. We think it is settled beyond dispute by the adjudications of the Supreme Court of the United States and by this court that the act of Congress granted present title in the lands to the State and that they passed at once to the State. It is true there were words creating a condition subsequent upon which they were to revert to the United States. Here again happily we are relieved from all doubt by the prior judgment of this court and of the Supreme Court of the United States in *Railroad v. McGee*, 115 U. S. 469, in which it was unanimously held by both courts that there had been no forfeiture of these particular lands by breach of said condition subsequent. Said the Supreme Court of the United States: "It has often been decided that lands granted by Congress to aid in the construction of railroads *do not revert* after condition broken until a forfeiture has been asserted by the United States, either through judicial proceedings instituted under authority of law for that purpose, or through some legislative action legally equivalent to a judgment of ouster found at common law." *Railroad v. McGee*, 75 Mo. 522.

So that the title of the State and the Cairo & Fulton Railroad claiming through the State was not impressed with a trust upon the land and did not depend upon the performance of a condition precedent, but was a present grant which passed the title to the State, and was not and has never been forfeited for breach of the condition subsequent at the suit of the United States government, the only party who could complain of any supposed violation of the trust confided in the State. It remains to examine the contention that the holding that the act of 1857 created a first lien upon "the Congress lands" is contrary to sound principles of construction because the effect of such construction

.necessarily would tie up the sale of the land for thirty years.

As to this claim it follows from what has already been said that by the grant to the State the title to the lands passed to the State unimpressed with a trust or lien in favor of the United States. By the act of 1855 the State, by a legislative grant, also *in praesenti,* passed the same lands to the railroad company, and in the same year loaned the road State aid bonds to the amount of $250,000, and reserved a statutory mortgage on the road and its appurtenances. It is, we think, obvious that according to settled legal principles the company could sell and mortgage these lands for the purpose of furthering the object of its incorporation, but lest there might be some question the power to sell or mortgage was expressly conferred upon it. But while the company had this express right to sell or mortgage these lands and use the proceeds in building the road, it is claimed that to permit it to borrow $400,000 from the State and mortgage *all of its property, including these lands,* would abrogate the privileges conferred by the act of 1855. Let us for a moment look at this from the company's standpoint. It was empowered to sell or mortgage these lands to individuals, but this may have been disappointing. We do not know what retarded these sales, but it may have been the stagnation which preceded and resulted in panic of 1857. At any rate two years had elapsed and it had a large body of unimproved lands on its hands, and it is found seeking a loan of $400,000 of the State. The road construed its grant to permit a mortgage to get funds in an amount to be of practical assistance. In the language of the Supreme Court of the United States when this question was before it in *Wilson v. Boyce, supra:* "It was quite within the competency of the railroad company to mortgage its lands not used for its track or

appurtenances. It might be deemed prudent and judicious to raise money upon its collateral property rather than upon its road. It might lose its foreign lands, and still be successful as a railroad company.''

Two alternatives were presented to the railroad. To continue to sell its lands by piecemeal to actual settlers, or mortgage those lands and raise the sum of $400,000 which would enable it to make some considerable progress toward its completion. There is nothing irreconcilable in the two statutes. Of course, if it chose to borrow from the State, the effect would be that the sale to individuals would be practically postponed, but it would be a voluntary choice and in no sense an abrogation of the statute of 1855. The act of 1857 was an amendment of the act of 1855 by and with the consent of the company whereby the security of the State was extended over all the property and lands of the road, whereas by the act of 1855 it covered only the road and its appurtenances. It was an aid act of which the company promptly availed itself. From the State's point of view, the motive appears simple. ''Time has passed without a completion of the road. A large additional loan was now made and a desire to receive additional security gives a natural and logical explanation of the additional words inserted in the mortgage.'' Such has been the construction of the act of 1857 by this court and the Supreme Court of the United States. But whatever the motive, it was entirely competent for the legislature to fix the terms upon which it would grant the State's aid. This it did by plain, unambiguous language, and when this is done it is not the province of the judiciary to speculate at this time as to what the state should have done. Says Judge Cooley: ''The moment a court ventures to substitute its own judgment for that of the legislature, in any case where the Constitution has vested the leg-

islature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority and when its discretion alone will measure the extent of its interference. The judiciary can not run a race of opinions upon points of right reason and expediency with the law-making power."

We think that the plaintiff's grandfather, as purchaser from the trustees, Moore, Wilson and Waterman, had notice of the State's prior lien obtained by the act of March 3, 1857; that said lien covered the land in suit; that it passed by the "sell out" acts of 1866, and that defendant having acquired his title thereto under said prior lien, should have recovered upon the the admitted facts, and that the opinion of this court on the former appeal was a misapplication of the act of 1857. The judgment is reversed and cause remanded with directions to enter judgment for defendant. BARCLAY, C. J., concurs in the judgment on the grounds stated in the first and second paragraphs of the opinion but deems it unnecessary to express his opinion on the subject discussed in the third paragraph. ROBINSON, J., concurs *in toto*. MACFARLANE, J., concurs in the first and second paragraphs, but dissents as to the third. BRACE, J., concurs in the first, and dissents as to the second and third paragraphs. SHERWOOD and BURGESS, JJ., concur in the above opinion but not in all the language employed.